STATE of Wisconsin, Plaintiff-Respondent,

v.

Antwan B. MANUEL,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2003AP113–CR. Oral argument March 3, 2005.
—Decided June 10, 2005.*

2005 WI 75

(Also reported in 697 N.W.2d 811.)

For the defendant-appellant-petitioner there were briefs and oral argument by *Steven D. Phillips,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Gregory M. Weber,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. LOUIS B. BUTLER, JR., J. Antwan Manuel seeks review of a published court of appeals' decision[1] that affirmed his convictions, which included attempted first-degree homicide and five related offenses. Manuel shot Prentiss Adams in the neck while Adams was sitting in his car talking to Derrick Stamps. Shortly after the incident, Stamps made several statements to his girlfriend that incriminated Manuel. A couple of days later, the girlfriend revealed these statements to a police officer when the officer was arresting Stamps. At Manuel's trial, Stamps invoked his privilege against self-incrimination, and the girlfriend claimed she could

---

[1] *State v. Manuel,* 2004 WI App 111, 275 Wis. 2d 146, 685 N.W.2d 525.

not remember what Stamps told her, but the State introduced Stamps' statements through the arresting police officer.

¶ 2. A number of issues revolve around Stamps' hearsay statements. The court of appeals concluded that: (1) the statements were admissible under the statement of recent perception exception; (2) their admission did not violate Manuel's right of confrontation; and (3) Manuel's trial counsel was not ineffective for failing to impeach Stamps' credibility with the number of Stamps' prior convictions after Stamps' statements were admitted into evidence. *State v. Manuel,* 2004 WI App 111, 275 Wis. 2d 146, 685 N.W.2d 525. Manuel argues that this court should reverse on any of these conclusions.

¶ 3. We affirm the court of appeals' decision. We conclude that the trial court did not erroneously exercise its discretion by admitting Stamps' statements as statements of recent perception. Further, we conclude that Stamps' statements were not "testimonial" under the recently announced decision of *Crawford v. Washington,* 541 U.S. 36 (2004). We retain the analysis of *Ohio v. Roberts,* 448 U.S. 56 (1980), for scrutinizing nontestimonial statements under the Confrontation Clause and Article I, Section 7 of the Wisconsin Constitution. Applying *Roberts,* we conclude that the statement of recent perception hearsay exception is not "firmly rooted." However, because Stamps' statements contain particularized guarantees of trustworthiness, we hold that admission of Stamps' statements did not violate Manuel's confrontation rights. Finally, we conclude that Manuel's trial counsel was not ineffective. Therefore, the decision of the court of appeals is affirmed.

## I

¶ 4. On June 25, 2000, shortly after midnight, Adams was driving his vehicle down Fisher Street in Madison, Wisconsin. As he drove by a group of men standing on a sidewalk, one of the men, later identified as Stamps, flagged Adams over to the side of the street. The two spoke about an altercation that occurred between their groups of friends a few days earlier. While Adams remained in his vehicle to speak with Stamps, Manuel allegedly reached around Stamps and shot Adams in the neck. Adams stated that he saw Manuel's face, head, and arm as Manuel reached around the right side of Stamps and fired at Adams. Adams knew Manuel prior to the incident, as he had seen him in the neighborhood approximately 20 times.

¶. 5. Adams immediately drove himself to the hospital. There, he spoke with Detective Alix Olsen. Adams told Olsen the address of where the incident took place and limited details about the shooting. Olsen proceeded to the crime scene where other officers had begun investigatory work. The police did not find much evidence around the scene but they preserved foot impressions left in a muddy spot between the sidewalk and the street on Fisher Street.

¶ 6. Around 4:00 a.m., Olsen visited Adams again in the hospital. Adams recounted the incident again, but this time with more details. He described the car of the shooter and gave the nicknames of both the shooter, "Twin" (Manuel), and the man who waived him down, "Tick" (Stamps).

¶ 7. At about 1:30 p.m. the same day, Olsen yet again visited Adams at the hospital, this time along with Detective Matthew Misener. During this meeting, the detectives showed Adams six photo arrays, with six

different pictures in each lineup. Adams identified Manuel as the man who shot him and said he was "a hundred percent sure." Adams also identified a photo of Stamps as the man who waved him over to the side of the street.

¶ 8. After completing the photo array, Olsen and Misener met with members of the Madison Gang Task Force and asked them to arrest Stamps and Manuel. Around 6 p.m. on June 25, 2000, police officers and gang task force members followed Manuel in his car before performing a felony stop. Manuel cooperated with the officers and was subsequently arrested. His car was removed from the scene and taken to a police station, where police recovered numerous pairs of shoes from the vehicle's trunk.

¶ 9. Two days later, on June 27, 2000, the police arrested Stamps at the apartment of his girlfriend, Anna Rhodes. When the police took Stamps into custody, Rhodes asked the police why Stamps was being arrested. The arresting officer, Misener, replied that Stamps may have been involved in a shooting and was being arrested on a probation hold. According to Misener, Rhodes responded, "Why, because he was with the guy that shot that dude?" When Misener asked Rhodes for the source of her information, Rhodes said that Stamps told her that he "was there when Twin [Manuel's knickname] shot the guy."

¶ 10. Misener also said that Rhodes told him that Stamps said he was talking to Adams after Adams pulled his vehicle over to the roadside. At that point, Misener stated that Rhodes indicated that Stamps told her that Manuel "came out of nowhere." Misener then said that Rhodes told him that Stamps told her he

heard gunshots and all of a sudden saw Manuel. Stamps did not tell her, however, whether he actually saw Manuel holding a gun.

¶ 11. The State charged Stamps with attempted first-degree intentional homicide as party to a crime, but later dropped the charge. The State charged Manuel with attempted first-degree intentional homicide, aggravated battery, reckless use of firearm, possession of firearm by a felon, bail jumping, and second-degree reckless injury.

¶ 12. The day before Manuel's trial was to commence, Manuel filed a motion in limine, seeking to prevent the admission of statements Stamps made to Rhodes. Manuel argued that Rhodes lacked personal knowledge of the shooting and that Stamps' statements were hearsay. The State claimed that Stamps' statements to Rhodes were admissible under the statement of recent perception exception. *See* Wis. Stat. § 908.045(2) (2001–02).[2] The State argued that Stamps was simply trying to tell Rhodes about the events with which he had just been involved so that she would have a reason to go with him to a motel. The Dane County Circuit Court, Honorable P. Charles Jones, agreed with the State and denied the motion.

¶ 13. At Manuel's trial, the State called Stamps as a material witness, but he invoked his Fifth Amendment privilege against self-incrimination. Rhodes was also called to testify, but she claimed that she could not recall anything that Stamps told her about the shooting or what she told the police Stamps told her. She merely testified that she learned about a shooting from Stamps the day of the incident and that they then went to a

---

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

motel for a couple of days. The State then introduced the statements Stamps made to Rhodes regarding the crime through the arresting officer, Misener.

¶ 14. Apparently, as of the time of the trial, Stamps had four prior criminal convictions. This was never raised at trial to impeach Stamps' credibility as it related to the statements he made to Rhodes.

¶ 15. Adams also testified, and again identified Manuel as the shooter. To corroborate Adams' identification, the State called Charles Cates, a footwear examiner at the Wisconsin State Crime Lab. He studied the shoes found in Manuel's trunk and the impressions made on Fisher Street between the sidewalk and the street on the night of the shooting. Cates testified that the impression matched the make, design, and pattern of the K-Swiss brand of shoe worn by Manuel. Thus, he opined that the shoes found in Manuel's trunk probably made the impressions.

¶ 16. The jury convicted Manuel on all charges.

¶ 17. Manuel filed a motion for a new trial, asserting that: (1) the court erred by denying the motion in limine; (2) the defendant's confrontation rights were violated by admitting Stamps' statements; (3) trial counsel was ineffective for failing to argue the confrontation issue; and (4) trial counsel was ineffective for failing to impeach Stamps' credibility with his four prior convictions. The circuit court, the Honorable Stuart A. Schwartz, denied the motion.

¶ 18. Manuel appealed, and the court of appeals affirmed. The court of appeals agreed with the circuit court that Stamps' statements were admissible under the statement of recent perception exception. *Manuel,* 275 Wis. 2d 146, ¶¶ 12–16.

¶ 19. Turning to Manuel's confrontation violation claim, the court of appeals noted that Stamps' state-

ments did not fit within any of *Crawford*'s[3] express categories of testimonial statements and were not made to an agent of the government or to someone engaged in investigating the shooting. Further, the court of appeals determined that the statements were not the type of statement *Crawford* depicted as the " 'primary object' of the framer's concerns in enacting the confrontation clause." *Manuel,* 275 Wis. 2d 146, ¶ 21 (*citing Crawford,* 541 U.S. at 50–53, 68). Thus, the court of appeals concluded that the statements were nontestimonial. *Id.*

¶ 20. In view of *Crawford*'s repudiation, not overruling, of *Roberts,* and in view of *Crawford*'s equivocation on how nontestimonial evidence is to be gauged, the court of appeals proceeded with "an abundance of caution" in analyzing Stamps' nontestimonial statements under the *Roberts*' test. *Id.,* ¶¶ 22–23. Using *Roberts,* the court of appeals concluded that the recent perception exception is not a firmly rooted hearsay exception. *Id.,* ¶ 25. However, the court of appeals concluded that there were sufficient particularized guarantees of trustworthiness surrounding Stamps' statements, which were: (1) the statements were made in good faith and without contemplation of pending litigation; (2) Stamps did not have a motive to fabricate; (3) the statements were spontaneous, motivated by Stamps' need to explain why he wanted to take Rhodes and their son to a motel. *Id.,* ¶ 27.

¶ 21. The court of appeals also rejected Manuel's claim that his counsel was ineffective for failing to introduce Stamps' four prior convictions in order to impeach his credibility after his statements were introduced through Misener. The court of appeals concluded that there was ample evidence that already impeached

---

[3] *Crawford v. Washington,* 541 U.S. 36 (2004).

Stamps' credibility, including his affiliation with a gang and that he was arrested and taken to jail on a probation hold. *Id.*, ¶ 32. Alternatively, given the strength of the evidence supporting the verdict—Adams' 100 percent sure identification of Manuel as the shooter, and the circumstantial and physical evidence that tied Manuel to the scene—the court of appeals concluded that Stamps' credibility was not crucial to the State's case against Manuel. *Id.*, ¶ 33. Therefore, because the court of appeals determined that there was not a reasonable probability that the result of Manuel's trial would have been different if his counsel had established that Stamps had been convicted of four crimes, the court of appeals rejected Manuel's ineffective assistance of counsel claim. *Id.*, ¶ 34.

¶ 22. Manuel seeks review.

## II

¶ 23. Because Manuel raises a confrontation violation, we must first determine whether Stamps' statements were admissible under the rules of evidence. *State v. Tomlinson,* 2002 WI 91, ¶ 41, 254 Wis. 2d 502, 648 N.W.2d 367. Thus, the first issue is whether the trial court properly determined that Stamps' statements were admissible under the statement of recent perception exception to the hearsay rule. *See* Wis. Stat. § 908.045(2).

¶ 24. A trial court's decision to admit evidence is discretionary, and this court will uphold that decision if there was a proper exercise of discretion. *State v. Pharr,* 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). When reviewing an evidentiary decision, "the question on

appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record." *State v. Stinson,* 134 Wis. 2d 224, 232, 397 N.W.2d 136 (Ct. App. 1986). A proper exercise of discretion requires that the trial court rely on facts of record, the applicable law, and, using a demonstrable rational process, reach a reasonable decision. *Martindale v. Ripp,* 2001 WI 113, ¶ 28, 246 Wis. 2d 67, 629 N.W.2d 698. If a trial court fails to adequately set forth its reasoning in reaching a discretionary decision, we will search the record for reasons to sustain that decision. *McCleary v. State,* 49 Wis. 2d 263, 282, 182 N.W.2d 512 (1971).

██

¶ 25. If Stamps' statements were admissible under the rules of evidence, then the second issue is whether the admission of that statement violated Manuel's right to confrontation. Whether admission of hearsay evidence violates a defendant's right to confrontation presents a question of law we review de novo. *State v. Weed,* 2003 WI 85, ¶ 10, 263 Wis. 2d 434, 666 N.W.2d 485.[4]

██

¶ 26. If there was no confrontation violation, then the last issue is whether Manuel's trial counsel was ineffective for failing to introduce the number of Stamps' prior criminal convictions to impeach Stamps'

---

[4] As we choose to address the merits of this issue, we need not decide whether Manuel's trial counsel was ineffective for failing to raise a contemporaneous confrontation violation objection to Stamps' statement. *See Gross v. Hoffman,* 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need be addressed).

credibility. We review a claim of ineffective assistance of counsel under a mixed question of fact and law standard. *State v. Erickson,* 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999). We will not set aside a trial court's findings of fact unless they are clearly erroneous. *Id.* However, whether the attorney's performance is constitutionally deficient is a question of law this court reviews de novo. *Id.*

III

■

¶ 27. Manuel first argues that the trial court erroneously exercised its discretion by admitting Stamps' statements regarding the shooting. He claims that the statements cannot fall under the statement of recent perception exception to the hearsay rule because there is no evidence that Stamps' statements were "made in good faith" and "not in contemplation of pending or anticipated litigation in which the declarant was interested." *See* Wis. Stat. § 908.045(2). To the contrary, Manuel submits that Stamps was anything other than a disinterested witness to the shooting, as Manuel claims Stamps played a major role in the incident even if he was not criminally liable. Further, Manuel asserts that Stamps' statements must have been in contemplation of pending litigation because he must have known that the shooting would be investigated and someone would be prosecuted. Manuel claims that Stamps' fear of this impending litigation undoubtedly explains why he persuaded Rhodes to go to the Sun Prairie motel with him. We are not persuaded.[5]

---

[5] Because we conclude the evidence was properly admitted as an exception under the hearsay rules, we decline to consider

¶ 28. The statement of recent perception exception "is similar to the hearsay exceptions for present sense impression and excited utterances, but was intended to allow more time between the observation of the event and the statement." *Weed,* 263 Wis. 2d 434, ¶ 15 (citation and quotations omitted). The purpose of the exception "is to admit probative evidence which in most cases could not be admitted under other exceptions due to the passage of time." *Id.* (citation omitted).

¶ 29. Wisconsin Stat. § 908.045(2), which contains the statement of recent perception exception, states:

> A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which the declarant was interested, and while the declarant's recollection was clear.

As this court summarized in *Weed,* for a statement to fit recent perception exception, it must pass the following three criteria:

> (1) the statement was not made in response to the instigation of a person engaged in investigating, litigating, or settling a claim and was made in good faith with no contemplation of pending or anticipated litigation in which the declarant would be an interested party; (2)

Manuel's alternative argument that its admission was not harmless error. For this same reason, we do not consider the State's alternative argument that Stamps' statement was admissible under the residual hearsay exception. *See Gross,* 227 Wis. at 300.

the statement narrated, described, or explained an event or condition recently perceived by the declarant; and (3) the statement was made while the declarant's recollection is clear.

*Weed,* 263 Wis. 2d 434, ¶ 14 (citation and quotations omitted). Only the first criterion is at issue here.[6]

¶ 30. According to 7 Daniel D. Blinka, *Wisconsin Practice: Wisconsin Evidence,* § 8045.2 at 710 (2d ed. 2001), the statement of recent perception exception "mainly focus[es] on the declarant's mental state at the time the statement was made." Because the exception is based on unavailability, however, the exception's criteria "must be inferred from the statement itself and the surrounding circumstances." *Id.*

¶ 31. With regard to the specifics of the first criterion, we first note that Stamps' statements were not made in response to the instigation of a person engaged in investigating, litigating, or settling a claim. Stamps made his statements to his girlfriend shortly after the shooting, just before they went with their son to a motel in Sun Prairie. The trial court ruled that Rhodes' testimony formed the basis for Stamps' comments about what had occurred and for their behavior afterwards. There simply is no evidence that Stamps' comments were made in response to the instigation of Rhodes, and it is clear that she was in no way investigating, litigating, or setting a claim.

¶ 32. Regarding good faith, whether a statement is made in "good faith" depends on "the declarant's incentive to accurately relate the event or condition."

---

[6] There is no question that the statements by Stamps "narrated, described, or explained" an event recently perceived by him, and that the statements were made while his recollection was clear.

*Id.* at 710–11. Similarly, the "not in contemplation of pending or anticipated litigation" requirement "may be inferred circumstantially from a consideration of whether a lawsuit has been filed, lawyers have been contacted, and the manner in which the subject matter came up during the conversation in which the statement was made." *Id.* at 711.

¶ 33. At the trial court, the State submitted that the statements were made in good faith and not in anticipation of litigation because Stamps "was simply trying to tell [his girlfriend] what happened . . . so that she would have a reason also to get out of the house to go with him to this motel to get away from the police officers." The trial court agreed, indicating that Stamps' statements "formed the basis . . . for [Stamps' and Rhodes'] behavior thereafter." Viewing the surrounding circumstances, the trial court concluded that the statement was nothing more than a justification to prompt Rhodes to go to a motel. Thus, the trial court essentially found that there was no indication the statement was made in bad faith and was not made in anticipation of litigation. We cannot conclude this assessment was unreasonable.

¶ 34. Manuel asserts the statement could not have been made in good faith and was made in anticipation of litigation, given that "Stamps was hardly a disinterested witness to the shooting;" that Stamps "certainly knew that [the police] would investigate the shooting, that they would interview eyewitnesses, and that they would arrest and prosecute those who were involved;" and that Stamps "likely surmised that Adams could identify him as the person who flagged him down." While Manuel advances conceivable alternative accounts for why Stamps made the statement, the trial court essentially rejected them by acquiescing to the

State's arguments. *See Hagenkord v. State,* 100 Wis. 2d 452, 464, 302 N.W.2d 421 (1981) (upholding discretionary ruling despite the absence of "an express ruling or an articulation of reasons," where record indicates trial court "acquiesced in the explanation of the prosecutor"). Because the trial court arrived at a reasonable result, and because we are reviewing that decision for an erroneous exercise of discretion, we affirm its decision.

## IV

■

¶ 35. Next, Manuel argues that even if the statement was admissible, its admission violated his right of confrontation.[7] We do not agree.

## A

■

¶ 36. "The Confrontation Clauses of the United States and Wisconsin Constitutions guarantee criminal defendants the right to confront the witnesses against them." *State v. Hale,* 2005 WI 7, ¶ 43, 277 Wis. 2d 593, 691 N.W.2d 637; U.S. Const. amend. VI; Wis. Const. art. I, § 7.[8] In light of the Supreme Court's recent alteration

---

[7] *We review only whether Stamps' statement to Rhodes violated Manuel's confrontation rights. Manuel does not claim that Rhodes' statement to Misener constitutes a separate confrontation violation.*

[8] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Article I, Section 7 of the Wisconsin Constitution states that "[I]n all criminal prosecutions the accused shall

for the analysis of confrontation violations in *Crawford,* our first task is to determine whether Stamps' statements were "testimonial." "[W]here "testimonial" hearsay evidence is at issue, the Sixth Amendment demands what the common law required: (1) unavailability and (2) a prior opportunity for cross-examination." *Hale,* 277 Wis. 2d 593, ¶ 51 (citing *Crawford,* 541 U.S. at 68).

¶ 37. In *Crawford,* the Court concluded that the "principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford,* 541 U.S. at 50. Thus, not all hearsay implicates the Confrontation Clause's core, only that which is "testimonial." *Id.* at 51. While the Court established the boundaries of the Confrontation's Clause's core, it declined to define them with a comprehensive definition of "testimonial." It did note that "testimony" is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.* From this "core class" of testimonial statements, the Court indicated that testimonial statements could be characterized by three various formulations, all of which "share a common nucleus and then define the Clause's coverage at various levels of abstraction around it," *id.* at 52:

> (1) "[*E*]x *parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant

enjoy the right . . . to meet the witnesses face to face." Generally, we apply United States Supreme Court precedents when interpreting the right of confrontation contained in our constitution. *See State v. Hale,* 2005 WI 7, ¶ 43, 277 Wis. 2d 593, 691 N.W.2d 637; *but compare Maryland v. Craig,* 497 U.S. 836, 847–50 (1990), *with* Wis. Const. art. I, § 7.

was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially" *Id.* at 51.

(2) "[E]xtrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *Id.* at 51–52.

(3) "[S]tatements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52.

¶ 38. Under any of these formulations, the Court was able to indicate that "[w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68. These, the Court wrote, represent "the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed."[9] *Id.*

¶ 39. Stamps' statements clearly do not fall within these specified minimums that the Court highlighted. Further, we agree with the State that Stamps' statements are not testimonial under any of the three formulations set forth in *Crawford.* Because we conclude that Stamps' statements are not testimonial under any of these formulations, and because *Crawford* marks "a new day [that] has dawned for Confrontation Clause jurisprudence," *Hale,* 277 Wis. 2d 593, ¶ 52, we are reluctant to accept Manuel's invitation to choose among the three formulations as the proper test for

[9] On the other end of the spectrum are "nontestimonial" statements. The Court portrayed this type of statement as "[a]n off-hand, overheard remark," "a casual remark to an acquaintance," business records, or statements in furtherance of a conspiracy. *Crawford,* 541 U.S. at 51, 56.

measuring whether a statement is testimonial. The particulars of the various formulations have yet to be developed, and the facial desirability of choosing one formulation may come at the hidden expense of another. In short, we save for another day whether any of these formulations, or for that matter different formulations, surpass all others in defending the right to confrontation. For now, at a minimum, we adopt all three of *Crawford*'s formulations.

1

¶ 40. For a statement to be testimonial under the first formulation, it must be "ex parte in-court testimony or its functional equivalent." *Id.* at 51. Stamps' oral statements to his girlfriend at their apartment clearly do not fit this depiction.

2

¶ 41. For a statement to be testimonial under the second formulation, it must be an "extrajudicial statement[] . . . contained in formalized testimonial materials, such as [an] affidavit[], deposition[], prior testimony, or confession[]." *Id.* at 51–52. Again, Stamps' oral statements to his girlfriend at their apartment do not fit this depiction.

3

¶ 42. For a statement to be testimonial under the third formulation, it must be a "statement[] that [was] made under circumstances which would lead an objective witness reasonably to believe that the statement

would be available for use at a later trial." *Id.* at 52. We conclude that Stamps' statements to Rhodes were not testimonial under this formulation.

¶ 43. Other jurisdictions have begun to develop the parameters of *Crawford*'s third formulation. We turn to those jurisdictions for guidance.

¶ 44. In *People v. Cervantes,* 12 Cal. Rptr. 3d 774, 783 (Cal. Ct. App. 2004), the California Court of Appeal concluded that an out-of-court statement made by the defendants' accomplice to the accomplice's neighbor after the defendants and the accomplice committed a murder was not testimonial. The neighbor worked as a surgical medical assistant and knew the accomplice for 12 years. After the accomplice sought out the neighbor for medical care, the neighbor noticed the accomplice had several swollen lacerations on his hand. When she asked what happened, the accomplice answered that he and the defendants shot a man the night before. The neighbor reported this to the police. She later testified as to the accomplice's admissions at the defendants' trial. As is the case here, the defendants argued that the accomplice's statement to the neighbor was testimonial because the accomplice knew the neighbor would repeat the statement to the police. The California Court of Appeal disagreed.

¶ 45. Under *Crawford*'s third formulation for defining testimonial statements, the court of appeal concluded there was nothing in the record to suggest that the neighbor would report the accomplice's statements to the police. The court of appeal stated it "subscribe[d] to the view that [the accomplice] sought medical assistance from a friend of long standing who had come to visit his home." *Id.* at 783. Consistent with the accomplice's later fear of testifying, the court of appeal concluded that the "[accomplice's] statement appears to

578

have been made without any reasonable expectation it would be used at a later trial. Rather, it seems far more likely [that the accomplice] expected [that the neighbor] would not repeat anything he told her to the police." *Id.*

¶ 46. In *Woods v. State,* 152 S.W.3d 105, 114 (Tex. Crim. App. 2004), the Texas Court of Criminal Appeals held that a co-defendant's spontaneous statements to two different third-party acquaintances were not testimonial. There, the defendants killed two people. Prior to killing them, the co-defendant told one acquaintance that he "had a job to do" for the defendant but felt reluctant to do it. After killing them, the co-defendant told a second acquaintance that he used one of the victim's credit cards and purchased film tickets in the first acquaintance's name to make it look like that acquaintance killed the victims.

¶ 47. At the defendant's trial, the two acquaintances testified as to the co-defendant's statements. Although the co-defendant's second statement was made after the killing, the Texas Court of Criminal Appeals concluded that the co-defendant's statements were not testimonial because they were casual, spontaneous "street corner" statements. *Id.*

¶ 48. In *State v. Rivera,* 844 A.2d 191 (Conn. 2004), the defendant and a co-actor broke into a house to steal jewelry, killed the owner, and then burned the house down. Five months later, the co-actor confided in his nephew that he and the defendant committed the burglary. The co-actor also stated that when the victim walked in on them, the defendant strangled her to death and then lit the house on fire. A year and a half later, the state charged the defendant with murdering the victim. At the defendant's trial, the co-actor invoked

his Fifth Amendment privilege against self-incrimination, but the State introduced his statement through the nephew.

¶ 49. The Connecticut Supreme Court concluded the co-actor's statement to his nephew was a statement against penal interests and was not testimonial:

> [U]nlike a statement to the police, the circumstances under which the statement was made would not lead an objective witness reasonably to believe that the statement would be available for use at a later trial. Specifically, [the co-actor] made the statement in confidence and on his own initiative to a close family member, almost eighteen months before the defendant was arrested and more than four years before his own arrest. In light of these circumstances, [the co-actor's] communication to . . . his nephew[] clearly does not fall within the core category of ex parte testimonial statements that the court was concerned with in Crawford.

*Id.* at 202.

¶ 50. Similarly, in *People v. Shepherd,* 689 N.W.2d 721 (Mich. Ct. App. 2004), the defendant was charged with perjury after her boyfriend was convicted of fleeing, eluding, and assault. During the boyfriend's trial, the defendant testified that the boyfriend could not have been the culprit because he was not at the scene that night but rather was with her. After the boyfriend was convicted, the state charged the defendant with perjury. At the defendant's perjury trial, the state introduced statements that jail guards overheard the boyfriend make to relatives while the boyfriend was in jail awaiting his trial. Those statements implicated the boyfriend as the culprit for the fleeing, eluding, and assault crimes and thus contradicted the defendant's testimony at the boyfriend's trial.

¶ 51. The Michigan Court of Appeals concluded that the boyfriend's statements that the jail guards overheard were not testimonial. The court stated:

> [The boyfriend] was speaking to relatives, not to the guards, and made spontaneous, unprompted comments regarding his role in the fleeing and eluding and assault. Even under the broadest definition of testimonial, it is unlikely that [the boyfriend] would have reasonably believed that the statements would be available for use at a later trial.

*Id.* at 729.

¶ 52. In *Horton v. Allen,* 370 F.3d 75, 84 (1st Cir. 2004), a co-actor told someone named Garcia that he needed money and that a drug dealer had refused to furnish him drugs on credit. Later that night, the co-actor and the defendant killed the drug dealer and two other people. At the defendant's trial, Garcia testified as to the co-actor's statement, and the First Circuit Court of Appeals concluded that the statement was not testimonial under the third formulation because it was made during a private conversation. *Id.* at 84.

¶ 53. We find these cases persuasive. Applying them, we conclude that Stamps' statements to Rhodes were not testimonial. Stamps made the statements to Rhodes, his girlfriend, during what appears to be a spontaneous, private conversation that occurred shortly after the shooting. *See United States v. Manfre,* 368 F.3d 832, 838 n.1 (8th Cir. 2004) (statements "made to loved ones or acquaintances . . . are not the kind of memorialized, judicial-process-created evidence of which *Crawford* speaks."); *Horton,* 370 F.3d at 84; *Rivera,* 844 A.2d at 202; *Shepherd,* 689 N.W.2d at 729; *Woods,* 152 S.W.3d at 114. There is no dispute that Rhodes is not a government agent, nor is there any contention that Stamps somehow expected Rhodes to

report to the police what he told her. *See Cervantes,* 12 Cal. Rptr. 3d 774, 783. By all indications, the conversation was confidential and not made with an eye towards litigation. *See also State v. Vaught,* 682 N.W.2d 284, 291 (Neb. 2004) (concluding that four-year-old victim's statement to an emergency room physician that her uncle sexually assaulted her was not testimonial as there was no indication of a purpose to develop testimony for trial, nor any indication of government involvement in the initiation or course of the examination). Absent any evidence that Stamps was attempting to use Rhodes to mislead the police on his own behalf, we conclude that Stamps' statements cannot be considered testimonial under *Crawford*'s third formulation.

## B

¶ 54. Having concluded that Stamps' statements are not testimonial under any of *Crawford*'s formulations, we must next determine the form and the substance of the constitutional analysis to be applied for nontestimonial statements. *Crawford* left this question debatable, writing that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law——as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford,* 541 U.S. at 68.

¶ 55. Manuel contends that until the Supreme Court offers definitive guidance on how to handle nontestimonial statements under the Sixth Amendment, we should assume that the Confrontation Clause still regulates the admission of nontestimonial statements. *Compare id.* at 53 ("[E]ven if the Sixth Amend-

ment is not solely concerned with testimonial hearsay, that is its primary object."), *with id.* at 68. Manuel submits that we should continue to rely on the *Roberts'* test to ensure reliability. Manuel notes that well before *Roberts,* the Court displayed concern for ensuring reliability of nontestimonial statements. *See Dutton v. Evans,* 400 U.S. 74, 89 (1970) ("[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." (citation and quotation omitted)). Further, Manuel claims, the advantage of maintaining *Roberts* is that the courts of this state are quite familiar with its application. Finally, Manuel notes a number of jurisdictions have embraced *Roberts* as the proper test for nontestimonial statements.[10]

¶ 56. In contrast, the State argues that we should assess nontestimonial statements only under the rules of evidence. The State points out that the *Crawford* Court noted that in *White v. Illinois,* 502 U.S. 346 (1992), the Court rejected the argument that the Confrontation Clause should be applied "only to testimonial statements, leaving the remainder to regulation by hearsay law." *Crawford,* 541 U.S. at 61. The *Crawford* Court indicated that its analysis "casts doubt on that holding," *id.,* but left for another day whether *White*

---

[10] *Horton v. Allen,* 370 F.3d 75, 83–84 (1st Cir. 2004); *People v. Corella,* 18 Cal. Rptr. 3d 770, 775 (Cal. Ct. App. 2004); *State v. Rivera,* 844 A.2d 191, 201–02 (Conn. 2004); *Doe v. Doe,* 103 P.3d 967, 972 (Idaho Ct. App. 2004); *State v. Dedman,* 102 P.3d 628, 636 (N.M. 2004) (applying *Roberts* on both state and federal constitutional grounds); *State v. Blackstock,* 598 S.E.2d 412, 422 n.2 (N.C. Ct. App. 2004); *Miller v. State,* 98 P.3d 738, 743–44 (Okla. Crim. App. 2004).

survived the *Crawford* decision. *Id.* Given *Crawford's* emphasis that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused," *id.* at 50, and because *Crawford's* historical analysis revealed that "not all hearsay implicates the Sixth Amendment's core concerns," *id.* at 51, the State submits that non-testimonial statements need satisfy only the rules of evidence to be admissible.

¶ 57. We decline to follow the State's position. Some, but not all, of the hearsay exceptions are premised on reliability. Many of the exceptions listed in Wis. Stat. § 908.03 "represent[] a determination of categorical reliability; that is, hearsay falling within any one of the rules carries with it guarantees of trustworthiness and reliability comparable to in-court testimony."[11] 7 Blinka, *Wisconsin Evidence,* § 801.1 at 523. On the other hand, the six "unavailability" exceptions in Wis. Stat. § 908.045 "balance considerations of reliability with need for the evidence. Conceptually, the categorical reliability of the six are insufficient to justify the hearsay's reliability except when there is a pressing need for the evidence because the declarant is unavailable to testify." *Id.* at 523. In short, as Professor Blinka notes:

> Although the confrontation clause and the hearsay rule are designed to protect similar values, they are not

---

[11] We do not decide that any hearsay that falls within any one of the exceptions listed in Wis. Stat. § 908.03 carries with it guarantees of trustworthiness and reliability comparable to in-court testimony. We merely acknowledge that that is Professor Blinka's view. We leave for future days and under different circumstances an analysis of the reliability of each of the exceptions listed in § 908.03.

identical. More to the point, the hearsay rule generally permits a wider array of statements than the confrontation clause.

*Id.* at 575.

¶ 58. This concern was recognized when the hearsay exceptions were promulgated in this state. The drafters expected that the exceptions would not displace constitutional principles. An accompanying Federal Advisory Committee note concluded:[12]

[A] hearsay rule can function usefully as an adjunct to the confrontation right in constitutional areas and independently in nonconstitutional areas. In recognition of the separateness of the confrontation clause and the hearsay rule, and to avoid inviting collisions between them or between the hearsay rule and other exclusionary principles, the exceptions set forth in Rules 803 and 804 are stated in terms of exemption from the general exclusionary mandate of the hearsay rule, rather than in positive terms of admissibility.

*Wisconsin Rules of Evidence,* 59 Wis. 2d R1, R229 (1974).[13]

---

[12] The Federal Advisory notes were not adopted but were provided for informational purposes. *Wisconsin Rules of Evidence,* 59 Wis. 2d R1, R2 ¶ 4 (1974).

[13] A corresponding Judicial Council Committee Note observed that after the Federal Advisory Committee Note was drafted, the United States Supreme Court decision in *California v. Green,* 399 U.S. 149, 155 (1970), substantiated the Federal Advisory Committee Note's assertions. In *Green,* the Supreme Court concluded that "[w]hile it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at

¶ 59. Thus, we conclude that it is unwise to establish a blanket-rule that blindly trusts the hearsay rules to safeguard constitutional rights. Although the rules are to be construed in such a manner as "to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined," Wis. Stat. § 901.02, they are no substitute for constitutional examination.[14]

¶ 60. While the *Crawford* Court abrogated *Roberts* by highlighting its shortcomings and failures, the Court declined to overrule *Roberts* and expressly stated that the states were free to continue using *Roberts* when dealing with nontestimonial hearsay. We accept Manuel's argument that *Roberts* ought to be retained for nontestimonial statements, as we agree that evidence that may be admissible under the hearsay rules may nevertheless still be inadmissible under the Confrontation Clause. Therefore, we join the jurisdictions that have used *Roberts* to assess nontestimonial statements.[15]

---

common law." *Id.; see also Bergeron v. State,* 85 Wis. 2d 595, 616, 271 N.W.2d 386 (1978) (same); *State v. Lenarchick,* 74 Wis. 2d 425, 432, 247 N.W.2d 80 (1976).

[14] That is not to say, however, that admission of statements under certain hearsay exceptions will not satisfy an alleged confrontation violation.

[15] *See infra* n.10. According to our research, no jurisdiction has accepted the argument advanced by the State. Further, our research indicates that only one reported case, a trial court decision, has construed *Crawford* as exempting nontestimonial hearsay from Confrontation Clause analysis altogether. *See People v. Conyers,* 777 N.Y.S.2d 274, 276 (N.Y. Sup. Ct. 2004). However, that conclusion seemed to rest on a misquotation of

¶ 61. *Roberts* established the following two-part test to determine the admissibility of out-of-court statements under the Confrontation Clause:

> First, the witness must be "unavailable" at trial. Second, the statement of the unavailable witness must bear adequate "indicia of reliability." This second prong could be inferred without more in a case where the evidence fell within a firmly rooted hearsay exception or upon a showing of "particularized guarantees of trustworthiness."

*Hale,* 277 Wis. 2d 593, ¶ 45 (citing *Roberts,* 448 U.S. at 66, 73). We conclude that Stamps' statements are admissible under the *Roberts* test.

### 1

¶ 62. There is no issue as to *Roberts'* first step, as all parties agree that Stamps made himself unavailable by invoking his privilege against self-incrimination. *See State v. Stuart,* 2005 WI 47, ¶ 62, 279 Wis. 2d 659, 695 N.W.2d 259; *See also* Wis. Stat. § 908.04(1)(a).

### 2

¶ 63. Moving on to the second step to determine whether the statement bears adequate indicia of reliability, Manuel initially contends that the "statement of

---

*Crawford. Compare id.* ("The [*Crawford*] Court further found that 'where a nontestimonial statement is at issue, such statement would be exempted from the Confrontation Clause altogether.'" (quoting *Crawford,* 541 U.S. at 68)); *with Crawford,* 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts,* and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.").

recent perception" exception is not a firmly rooted hearsay exception. The State recognizes Manuel's contention but does not respond, instead choosing to focus its argument on whether there are sufficient guarantees of trustworthiness. Although the State has conceded the point, for reasons we explain below, we conclude that Manuel is nonetheless correct.

¶ 64. A hearsay exception is firmly rooted "if, in light of longstanding judicial and legislative experience, it rests on such a solid foundation that admission of virtually any evidence within it comports with the substance of the constitutional protection." *Lilly v. Virginia*, 527 U.S. 116, 126 (1999) (citations, quotations and alterations omitted). This test "is designed to allow the introduction of statements falling within a category of hearsay whose conditions have proved over time to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath and cross-examination at a trial." *Id.* (citations and quotations omitted). In *Weed*, 263 Wis. 2d 434, ¶ 24, this court assumed that the statement of recent perception exception was not firmly rooted. We now conclude that it is not.

¶ 65. As the court of appeals noted below, the statement of recent perception exception was not known at common law. When the exception was promulgated in 1973, the accompanying Judicial Council Committee Note represented that "[t]his subsection is a major change in Wisconsin law which presently would characterize the statement as inadmissible hearsay." *Wisconsin Rules of Evidence*, 59 Wis. 2d at R314.

¶ 66. In addition to the exception's relative newness, the exception has not gained widespread acceptance. To the contrary, "Wisconsin is one of a small

number of jurisdictions that have adopted the exception for statements of recent perception." 7 Blinka, *Wisconsin Evidence,* § 8045.2 at 708. It seems that only three states have embraced the statement of recent perception exception: Hawaii, Kansas, and Wyoming.[16] *See* Haw. Rev. Stat. Rule 804(b)(5) (2002);[17] Kan. Stat. Ann. § 60–460(d)(3) (2005);[18] Wyo. Stat. Rule 804(b)(5)(2003).[19] Indeed, the Supreme Court included

---

[16] As of 1995, New Mexico's statement of recent perception exception has been removed from its rules of evidence. *State v. Ross,* 919 P.2d 1080, 1086 n.3 (N.M. 1996).

[17] Hawaii Rev. Stat. Rule 804(b)(5) (2002) states:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . . A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which the declarant was interested, and while the declarant's recollection was clear.

[18] Kansas Stat. Ann. § 60–460(d)(3) (2005) states:

A statement which the judge finds was made . . . if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort.

[19] Wyoming's statement of recent perception exception applies only in civil proceedings. Wyo. Stat. Rule 804(b)(5)(2003) ("The following are not excluded by the hearsay rule if the declarant is unavailable as a witness . . . In a civil action or proceeding, a statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim, which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear.").

the exception in its draft of the Federal Rules of Evidence. However, "Congress rejected it as 'unwarranted' based on concerns about reliability." 7 Blinka, *Wisconsin Evidence*, § 8045.2 at 708. As Professor Blinka notes, "The [exception's] reception has been decidedly mixed." *Id.*

¶ 67. In view of these considerations, we conclude that the statement of recent perception exception is not firmly rooted. Therefore, we must determine whether Stamps' statements contain particularized guarantees of trustworthiness.

■■■■■

¶ 68. To evaluate whether statements contain particularized guarantees of trustworthiness:

> [W]e consider the "totality of the circumstances, but . . . the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." [Idaho v. Wright, 497 U.S. 805, 819 (1990)]. Some factors that have been considered in assessing the reliability of a statement include spontaneity, consistency, mental state, and a lack of motive to fabricate. *Id.* at 821. We look to see "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility . . . ." *Id.* at 820. In other words, we examine whether the statement is "so trustworthy that adversarial testing would add little to its reliability." *Id.* at 821.

*Weed,* 263 Wis. 2d 434, ¶ 25. We conclude that there are adequate particularized guarantees of trustworthiness surrounding Stamps' statements.

¶ 69. Stamps' statements were spontaneously made shortly after the shooting. There is no indication that Stamps spoke with a "studied reflection of the situation" or made the statements in bad faith. Nor is

there any indication that Stamps made the statements after being provoked by questioning. Instead, Stamps' statements were volunteered statements that were made to his girlfriend, also the mother of his child, and were nothing more than an explanation of where he was and what had occurred and an instigation for what they had to do next (i.e., get to a motel). There is no basis on which to conclude that Stamps made the statements to his girlfriend in anything but in confidence.

¶ 70. We agree with the State that it cannot reasonably be said that Stamps had an ulterior motive to fabricate, as any statement placing Stamps at the scene makes him a potential suspect, or in the very least a person of interest. And as the court of appeals observed, Stamps implicated a fellow gang member, not a member of a rival gang or some other enemy. *Manuel*, 275 Wis. 2d 146, ¶ 13. Therefore, after reviewing the totality of the circumstances, we conclude that Stamps' statements contain sufficient particularized guarantees of trustworthiness to satisfy the Confrontation Clause.

V

¶ 71. Lastly, Manuel argues that once Stamps' statements were admitted, his trial counsel was ineffective for failing to impeach Stamps' credibility with the number of his prior convictions. We conclude that Manuel was not prejudiced by this failure.

¶ 72. "To prevail on an ineffective assistance of counsel claim, the defendant must show that counsel's actions or inaction constituted deficient performance and that the deficiency caused him prejudice." *State v. Brunette*, 220 Wis. 2d 431, 445, 583 N.W.2d 174 (Ct.

App. 1998). To prove deficiency, the defendant must establish that counsel's conduct falls below an objective standard of reasonableness. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *State v. Thiel,* 2003 WI 111, ¶ 20, 264 Wis. 2d 571, 665 N.W.2d 305. To prove prejudice, the defendant must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.,* ¶ 20 (quoting *Strickland,* 466 U.S. at 694). We need not discuss both of these prongs if there is an insufficient showing on one.[20] *Weed,* 263 Wis. 2d 434, ¶ 34 (citing *Strickland,* 466 U.S. at 697).

¶ 73. Manuel correctly notes that when hearsay has been admitted, the declarant's credibility may be attacked as if the declarant had testified as a witness. *See* Wis. Stat. § 908.06.[21] Manuel's trial counsel did not introduce the fact that Stamps had four prior criminal convictions. Although "all prior convictions are relevant

---

[20] Manuel's trial counsel conceded he had no strategy for failing to impeach Stamps' credibility with the four prior convictions. We conclude that Manuel's counsel was deficient for failing to impeach the credibility of a key witness.

[21] Wisconsin Stat. § 908.06 states:

When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked, may be supported by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination.

to a witness'[s] character for truthfulness," *State v. Gary M.B.,* 2004 WI 33, ¶ 23, 270 Wis. 2d 62, 676 N.W.2d 475, we conclude that Stamps' credibility had been sufficiently attacked, such that the failure to introduce the prior convictions did not prejudice Manuel.

¶ 74. The jury heard that Stamps was a member of a gang, and Misener, the officer who took Rhodes' statement as to what Stamps told her, testified that Stamps was arrested and taken to jail on a probation hold. We agree with the State that it is fair to say that most people know that an individual has been convicted of a crime if he or she is on probation. As the court of appeals concluded, "that fact is not so obscure as to be beyond the knowledge of the average juror." *Manuel,* 275 Wis. 2d 146, ¶ 32. With Stamps' status as a criminal made clear, "the exact number of convictions might have incrementally weakened the credibility of the witnesses, [but] this decrease is not enough to establish a reasonable probability that the jury would have reached a different verdict." *State v. Trawitzki,* 2001 WI 77, ¶ 44, 244 Wis. 2d 523, 628 N.W.2d 801.

¶ 75. In addition, more importantly, there is overwhelming evidence that supports the verdict. *See Strickland,* 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). The victim, Adams, identified Manuel as the shooter through both a photo array conducted shortly after the shooting and at trial. The identification was not premised on a momentary glimpse of the shooter. Adams indicated that he was positive Manuel was the shooter, as Adams had seen Manuel around the neighborhood many times before. Moreover, the State presented circumstantial physical

evidence that linked Manuel to the crime scene. Cates, the State Crime Lab analyst, testified that the shoes taken from the trunk of Manuel's car were consistent with the footprints that were preserved at the crime scene. Thus, because Stamps' credibility had been sufficiently attacked, and because the evidence against Manuel was overwhelming, we conclude that Manuel cannot establish that he was prejudiced by his trial counsel's performance.

## VI

¶ 76. In sum, we conclude that the trial court did not erroneously exercise its discretion by admitting Stamps' statements as statements of recent perception. Further, we conclude that Manuel's right to confrontation was not violated. Stamps' statements were not testimonial under any of *Crawford*'s formulations. However, we conclude that nontestimonial evidence must still be scrutinized under both the federal and state constitutions. Accordingly, we retain *Roberts* for that purpose. We conclude that the statement of recent perception exception is not firmly rooted. However, we hold that Manuel's confrontation rights were not violated because Stamps' statements contain particularized guarantees of trustworthiness. Finally, we conclude that Manuel's counsel was not constitutionally ineffective for failing to introduce the number of Stamps' prior convictions after Stamps' statements were introduced into evidence. We therefore affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.