# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP1818-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>            Plaintiff-Respondent,<br>    v.<br>Ramon G. Gonzalez,<br>            Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 349 Wis. 2d 789, 837 N.W.2d 178)
(Ct. App. 2013 – Unpublished)

| | |
|---|---|
| OPINION FILED: | December 3, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 9, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | William W. Brash |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | ABRAHAMSON, C.J., concurs. (Opinion filed.) |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, the cause was argued by *Kaitlin A. Lamb*, assistant state public defender, with whom on the briefs was *Andrea Taylor Cornwall*, assistant state public defender.

For the plaintiff-respondent, the cause was argued by *Daniel J. O'Brien*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP1818-CR
(L.C. No. 2006CF5455)

STATE OF WISCONSIN        :      IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent**

    **v.**

**Ramon G. Gonzalez,**

      **Defendant-Appellant-Petitioner**

**FILED**

**DEC 3, 2014**

Diane M. Fremgen
Clerk of Supreme Court

Review of a decision of the court of appeals. *Affirmed.*

¶1 N. PATRICK CROOKS, J. The question we consider in this case is whether Ramon Gonzalez's constitutional right not to be a witness against himself was violated when the court, over defense objection, asked in front of the jury that Gonzalez "display his teeth," and Gonzalez complied. Gonzalez argues that he was compelled to be a witness against himself at trial because the teeth, which were platinum, were more than physical evidence——they conveyed a message to the jury because they give him a "fierce" appearance. A witness had testified that the victim had identified one of his attackers as a fellow inmate

with platinum teeth.  The circuit court[1] ruling came after the prosecutor asked "for the jury's sake, that we show Mr. Gonzalez's dental work . . . so the witness can describe whether or not he has particular dental work."  Gonzalez was convicted of battery by a prisoner, as a party to a crime.

¶2  The question requires us to decide whether, in this case, teeth are the kind of evidence that implicates the Self-Incrimination Clause.[2]  Gonzalez acknowledges that it is well

---

[1] The jury trial was held in Milwaukee County Circuit Court, the Honorable William W. Brash III, presiding; Gonzalez's later motion for postconviction relief was denied by the Honorable David A. Hansher of the Milwaukee County Circuit Court.  In an unpublished opinion, the Court of Appeals affirmed.  State v. Gonzalez, No. 2012AP1818-CR, unpublished slip op. (Wis. Ct. App. July 23, 2013).

[2] The Fifth Amendment to the United States Constitution provides, in pertinent part, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  As will be discussed, the United States Supreme Court has interpreted that provision as prohibiting only "testimonial" communications:

> The term "privilege against self-incrimination" is not an entirely accurate description of a person's constitutional protection against being "compelled in any criminal case to be a witness against himself." The word "witness" in the constitutional text limits the relevant category of compelled incriminating communications to those that are "testimonial" in character.

United States v. Hubbell, 530 U.S. 27, 34-35 (2000) (footnotes omitted).  Our discussion concerns what constitutes testimonial evidence for purposes of the Self-Incrimination Clause, and we rely on the tests provided in cases dealing with self-incrimination.  We are aware that there are other cases in which courts determine what is testimonial, such as those involving an alleged Confrontation Clause violation.  See, e.g., State v.

(continued)

settled that the right against self-incrimination applies only to testimonial evidence, but he argues that in this case the physical evidence "had a 'testimonial' aspect because it revealed content——the 'fierce-looking' appearance of his teeth,"[3] and he says this fits within the category of cases where physical evidence has been held to have a testimonial aspect and, as a result, to fall under constitutional protection. He argues in the alternative that even if it has no testimonial aspect, it was improperly admitted because it was not material, given that other evidence served the purpose of identification. The State argues that his platinum teeth were physical evidence that did not have a testimonial aspect, and were material to the identification of Gonzalez, which was central to the trial.

¶3 We hold that the evidence of his platinum teeth was physical evidence that did not have a testimonial aspect sufficient to implicate constitutional protections. The relevant question under the case law is whether the evidence in question expresses, makes use of, reveals, or discloses the

---

Manuel, 2005 WI 75, ¶37, 281 Wis. 2d 554, 697 N.W.2d 811 (stating that "not all hearsay implicates the Confrontation Clause's core, only that which is 'testimonial'") (citation omitted).

[3] Pet'r's Br. 9.

contents of the defendant's mind.[4]  Teeth do not do so.  We also hold that Gonzalez's teeth are material to identification because they are probative of Gonzalez's identity, which was a matter at issue.[5]  This case therefore fits squarely into the long-recognized category of cases involving the body as evidence and does not offend constitutional principles against self-incrimination.  We affirm the court of appeals.

## I.   BACKGROUND

¶4   This case arises from an attack by multiple people on an inmate in the Milwaukee County Jail.  Gonzalez was among the inmates who were accused of attacking the victim.  He was charged with battery by a prisoner, as a party to a crime, and went to trial.  Challenging the identification of the accused as one of the attackers was the focus of the defense.  The victim was clearly reluctant to testify and repeatedly said so while

---

[4] See, e.g., Pennsylvania v. Muniz, 496 U.S. 582, 598 (1990) (quoting Doe v. United States, 487 U.S. 201, 210 n.9 (1988)) (holding evidence not testimonial where defendant not "forc[ed] to express the contents of his mind"); Hubbell at 43 (holding evidence testimonial where defendant was improperly required "to make extensive use of" or reveal "the contents of his own mind" in identifying documents responsive to subpoena); Hutchison v. State, 424 S.W.3d 164, 179 (Tex. App. 2014) (holding that act of handing over keys was not testimonial in nature because it did not disclose the contents of defendant's mind); State v. Holmes, 93 P.3d 212, 215 (Wash. Ct. App. 2004) (holding evidence testimonial if defendant is forced to disclose the contents of his mind or speak his guilt).

[5] State v. Becker, 51 Wis. 2d 659, 667, 188 N.W.2d 449 (1971) (holding that evidence probative of a matter in issue is material).

4

under oath; he claimed he was unable to identify his attackers. While video of the attack was shown to jurors, the defense disputed that the grainy video was sufficient to make an identification, and the State offered further evidence on that issue. The jury heard the following during testimony about the identification of Gonzalez and his involvement in the beating:

- An eyewitness, a deputy on duty at the jail, saw Gonzalez stomp on the victim during the fight.

- Minutes after the attack, the victim of the assault told an investigating officer that one of the persons involved was from Cell 10.

- While in the jail infirmary, the victim told a second investigating officer that the inmate in Cell 10 who had platinum teeth had hit and kicked him.

- The victim also testified that he knew Gonzalez by the nickname "Platinum" because of his teeth.

- Gonzalez was housed in Cell 10 and had platinum teeth.

No evidence was introduced that any other inmate besides Gonzalez fit this description.

¶5 During the trial, Gonzalez objected to the prosecutor's request, during a witness's testimony, that Gonzalez reveal his teeth to the jury. The circuit court overruled the objection. Gonzalez complied, and the record reflects that he smiled at the jurors to show his platinum teeth. Gonzalez's post-conviction motion for a new trial was denied, and the court of appeals affirmed the conviction on the grounds that the teeth were physical evidence, and thus

5

Gonzalez's showing of his platinum teeth did not constitute the kind of compelled testimonial evidence the United States and Wisconsin Constitutions prohibit. Gonzalez petitioned for review, which we granted.

## II. STANDARD OF REVIEW

¶6 The question we address is whether Gonzalez was compelled to provide the kind of evidence that is protected by the Fifth Amendment of the United States Constitution[6] and its corollary in the Wisconsin Constitution, which prohibit the State from compelling a defendant to be a witness against himself or herself. Although this case does not arise from a suppression motion or motion in limine, it similarly presents a question of a constitutionally-based objection to the admission of certain evidence. "Whether evidence should be suppressed is a question of constitutional fact. In reviewing questions of constitutional fact, we uphold a circuit court's factual

---

[6] "The Fifth Amendment, which applies to the States by virtue of the Fourteenth Amendment, provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.' U.S. Const., Amdt. 5." Maryland v. Shatzer, 559 U.S. 98, 103 (2010) (internal citations omitted). The parallel provision in the Wisconsin constitution provides, "No person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against himself or herself." Wis. Const. art. I, § 8. "Our interpretation of Article I, Section 8 of the Wisconsin Constitution has generally been consistent with the United States Supreme Court's interpretation of the Fifth Amendment to the federal Constitution." State v. Ward, 2009 WI 60, ¶18 n.3, 318 Wis. 2d 301, 767 N.W.2d 236 (citations omitted).

findings unless clearly erroneous, but we independently determine whether those facts meet the constitutional standard." State v. Samuel, 2002 WI 34, ¶15, 252 Wis. 2d 26, 643 N.W.2d 423 (citations omitted) (evaluating a constitutionally-based challenge to the admission of certain evidence).

### III. DISCUSSION AND ANALYSIS

¶7 The facts relevant to our discussion are not in dispute. It is not disputed that the evidence in question was compelled by the circuit court; Gonzalez was ordered by the court in open court to display his teeth to the jury. The dispute we address is solely one of law: whether this is the kind of evidence that cannot be compelled without violating constitutional guarantees. Gonzalez gives two reasons the evidence should not have been admitted. After setting out briefly the relevant law, we will address the parties' arguments on those two points.

### A. The Self-Incrimination Clause And Body-As-Evidence Cases

¶8 The United States Supreme Court has, in cases in which the self-incrimination clause has been invoked, repeatedly recognized that certain distinguishing characteristics of a defendant may be used against him or her even if they are incriminating. It summarized its interpretation of the self-incrimination clause concisely in United States v. Hubbell prior to starting its analysis in that case:

> It is useful to preface our analysis of the constitutional issue with a restatement of certain propositions that are not in dispute. The term "privilege against self-incrimination" is not an

7

entirely accurate description of a person's constitutional protection against being "compelled in any criminal case to be a witness against himself."

The word "witness" in the constitutional text limits the relevant category of compelled incriminating communications to those that are "testimonial" in character. As Justice Holmes observed, there is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct that may be incriminating. Thus, even though the act may provide incriminating evidence, a criminal suspect may be compelled to put on a shirt, to provide a blood sample or handwriting exemplar, or to make a recording of his voice. The act of exhibiting such physical characteristics is not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief.

United States v. Hubbell, 530 U.S. 27, 34-35 (2000) (footnotes omitted).

¶9 In clarifying what constituted testimonial evidence, the United States Supreme Court has differentiated between "communications" from the defendant and "his body as evidence": "The prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." Schmerber v. California, 384 U.S. 757, 763 (1966) (quoting Holt v. United States, 218 U.S. 245 (1910) (emphasis added)). "The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." Id. at 764. The Court has also described

8

testimonial evidence as "knowledge of facts [compelled from the defendant] relating him to the offense," "his thoughts and beliefs" and "evidence of a testimonial or communicative nature." Doe v. United States, 487 U.S. 201, 210, 213 (1988). In keeping with this distinction, courts have held that there is no violation of the Self-Incrimination Clause where a defendant is compelled to show his or her body, or to display tattoos, scars, physique, or limbs.[7]

¶10 However, the United States Supreme Court has recognized that some physical evidence has a sufficiently testimonial aspect to warrant Fifth Amendment protection.[8] As we will explain, those cases arise when a particular piece of compelled physical evidence reveals the thoughts of the defendant and those thoughts are incriminating. There are,

---

[7] 3 American Law Reports 4th 374, § 10[a] (1981), Propriety of requiring criminal defendant to exhibit self, or perform physical act, or participate in demonstration, during trial and in presence of jury (collecting cases where no violation of self-incrimination clause was found).

[8] Fisher v. United States, 425 U.S. 391, 411 (1976) (framing the relevant question as whether the evidence in question "rises to the level of testimony within the protection of the Fifth Amendment" and stating that a compelled handwriting sample is not "deemed to be sufficiently testimonial for purposes of the privilege"). In Fisher, the Court stated that "[t]he act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own . . . but the more difficult issues are whether the tacit averments of the taxpayer are both 'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment." Id. at 410. It concluded that even conceding the existence of some testimonial aspects, the evidence was not testimonial enough to warrant Fifth Amendment protections. Id. at 429-30.

then, two types of physical evidence: 1) physical evidence (including the body) that does not have a sufficiently testimonial aspect to warrant Fifth Amendment protection, and 2) physical evidence (including the body) that <u>does</u> have a sufficiently testimonial aspect to warrant such protection.

B.    Whether Gonzalez's Platinum Teeth Were Physical Evidence

With A "Testimonial Aspect"

¶11 Gonzalez's first argument is based on the proposition that physical evidence can nonetheless have a testimonial aspect that turns the evidence into the kind barred by the Fifth Amendment to the United States Constitution.  Such cases turn on the fact that the evidence in question in some way disclosed the contents of the defendant's mind.

¶12 Gonzalez argues that his platinum teeth constitute the kind of physical evidence that has a "testimonial aspect" that conveys or communicates an additional message, and that evidence is therefore testimonial for purposes of Self-Incrimination Clause analysis.  He points to <u>Pennsylvania v. Muniz</u>, a case in which the United States Supreme Court considered whether the Self-Incrimination Clause barred use of several pieces of evidence obtained from the defendant following a drunk driving arrest.  The booking officer asked Muniz his "name, address, height, weight, eye color, date of birth, current age, and the date of his sixth birthday."  <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 590 (1990).

¶13 As the lower court had found, "[b]oth the delivery and content of Muniz's answers were incriminating," as both tended

10

to support the inference that Muniz was intoxicated. Id. The responses to all questions were spoken in a slurred manner, and Muniz was unable to give the date of his sixth birthday. Id. But for purposes of Fifth Amendment analysis, the United States Supreme Court made a distinction between the manner in which Muniz answered questions, which it deemed a physical attribute, and the particular answer that revealed something about his thoughts——namely that he was so impaired that he was unable to perform the simple calculation of the date of his sixth birthday. Thus, it held,

> Under Schmerber and its progeny . . . any slurring of speech and other evidence of lack of muscular coordination revealed by Muniz's responses to Officer Hosterman's direct questions constitute nontestimonial components of those responses. Requiring a suspect to reveal the physical manner in which he articulates words, like requiring him to reveal the physical properties of the sound produced by his voice, does not, without more, compel him to provide a "testimonial" response for purposes of the privilege.

Muniz, 496 U.S. at 592 (citation omitted).

¶14 In contrast, it held that Muniz's answer about his sixth birthday did constitute testimonial evidence, because in answering it, he was forced to disclose something about his mental faculties:

> Muniz was left with the choice of incriminating himself by admitting that he did not then know the date of his sixth birthday, or answering untruthfully by reporting a date that he did not then believe to be accurate (an incorrect guess would be incriminating as well as untruthful). The content of his truthful answer supported an inference that his mental faculties were impaired . . . .

11

Id. at 599.

¶15 Another case where physical evidence took on a testimonial aspect involved a subpoena for some tax documents that were later used as the basis for criminal charges. What is significant for our purposes is the fact that the United States Supreme Court recognized that in some circumstances, compliance with a subpoena, which would ordinarily not implicate the Self-Incrimination Clause, could have a "compelled testimonial aspect." Hubbell, 530 U.S. at 45. In the context of a dispute over the terms of a grant of immunity, the Court noted that "[w]e have held that 'the act of production' itself may implicitly communicate 'statements of fact.' . . . Moreover . . . [the custodian] may be compelled to take the witness stand and answer questions designed to determine whether he has produced everything demanded by the subpoena." Id. at 36-37.

¶16 As these two cases illustrate, the factual scenarios in which physical evidence has a "testimonial aspect" sufficient to implicate constitutional protections are quite limited and unusual. Gonzalez cites only Muniz as an example of such a case; he argues that the platinum teeth evidence is like the sixth-birthday answer in Muniz in that both reveal too much—that both allow jurors to make improper negative inferences about the defendant. In response, the State simply points to the similarities between the facts of this case and the extensive body-as-evidence case law.

¶17 There is a crucial difference between the evidence in Muniz and the evidence here. In Muniz, the inference that

12

concerned the United States Supreme Court was an inference about the working of Muniz's mind that went directly to the crime of which he was accused: driving while intoxicated. The evidence the Court found problematic in Muniz was problematic not because it supported a negative inference, but because the particular negative inference it supported was "that his mental state was confused," an inference about the contents of his mind that both parties acknowledged was incriminating in a drunk driving prosecution. Gonzalez's display of his teeth did not disclose anything to the jury about his mental state or the content or workings of his mind.

¶18 Likewise, in Hubbell, where physical evidence was found to have a testimonial aspect that brought it under the Fifth Amendment, the Court found it significant that "the prosecutor needed the [defendant's] assistance both to identify potential sources of information and to produce those sources" and this required the defendant to take "the mental and physical steps necessary to provide the prosecutor with an accurate inventory of the many sources of potentially incriminating evidence." Hubbell, 530 U.S. at 42 (emphasis added). It therefore concluded that the defendant's "act of production had a testimonial aspect" that made the Fifth Amendment applicable. Id. at 45.

¶19 The content or message he claims the teeth convey——that he is tough and fierce (and therefore more likely to assault someone)——is not the type of disclosure that was problematic in Muniz; his teeth are not different from other

13

non-testimonial physical evidence, such as tattoos,[9] scars,[10] muscular arms,[11] teeth,[12] and results of an in-court test of defendant's eyes,[13] that courts have deemed physical evidence whose compelled display violates no constitutional right——even though some of those physical characteristics might likewise carry negative connotations or communicate an image of

---

[9] State v Rosthenhausler, 711 P.2d 625 (Ariz. Ct. App. 1985) (finding no constitutional violation where defendant was required to reveal tattoo).

[10] People v. Renfrow, 564 P.2d 411 (Colo. 1977) (finding no constitutional violation where defendant was required to reveal scar for purpose of corroborating identity).

[11] Doye v. State, 299 A.2d 117 (Md. Ct. Spec. App. 1973) (finding no violation where trial court ordered defendant to roll up sleeve to display muscular arm after victim described rapist).

[12] Sholler v. Commonwealth, 969 S.W.2d 706, 711 (Ky. 1998) (finding no constitutional violation where court compelled display of teeth after witness testified on cross-examination that defendant spoke with a lisp and was missing a front tooth); Huff v. State, 452 So. 2d 1352, 1353 (Ala. Crim. App. 1984) (finding no constitutional violation where court compelled display of teeth after a witness described a "big[] gap" in the robber's upper teeth).

[13] The Wisconsin Court of Appeals held that evidence gained during a compelled, in-court horizontal gaze nystagmus (HGN) test of the defendant's eyes conducted outside the presence of the jury was not testimonial (State v. Schmidt, 2012 WI App 137, 345 Wis. 2d 326, 825 N.W.2d 521). It has also held that an in-court voice sample did not constitute testimonial evidence, State v. Hubanks, 173 Wis. 2d 1, 496 N.W.2d 96 (Ct. App. 1992), and that evidence of physical acts during field sobriety tests was not testimonial, State v. Babbitt, 188 Wis. 2d 349, 525 N.W.2d 102 (Ct. App. 1994).

fierceness or toughness to some jurors.[14] Nor is there use made by the prosecutors of Gonzalez that is comparable to the use made by the prosecutors of Hubbell's mind that rendered the physical evidence testimonial in that case.

¶20 We therefore conclude that this is not a case in which physical evidence has a "testimonial aspect" that renders its use unconstitutional.[15]

C.  Whether The Display Of Gonzalez's Platinum Teeth Was Material

¶21 Gonzalez's second argument is that the availability of other identification evidence renders the display of his teeth for such purpose immaterial, and therefore inadmissible. Gonzalez cites Schmerber for the proposition that the law permits "[defendant's] body as evidence" only "when it may be material." Schmerber, 384 U.S. at 763. He argues that because other identification evidence existed, the display of his teeth was not for the purpose of identification, and therefore it was

---

[14] There is no evidence in the record that such a meaning would necessarily be attached to platinum teeth. We will accept for purposes of the argument that a negative inference would be drawn by jurors, but it is also possible that a juror who had never seen such teeth might have a neutral impression or merely find them silly.

[15] We recognize that the court of appeals reached a conclusion that is not consistent with our holding here when it considered this issue in a previous case. See State v. Smith, No. 00-2947-CR, unpublished slip op. (Wis. Ct. App. Sept. 5, 2001). The opinion was not published, and online court records show that no petition for review was filed in that case.

15

not, as required, material.[16] Specifically, he argues that "there was no need for the jury to determine whether Mr. Gonzalez in fact had platinum teeth,"[17] because the victim had identified Gonzalez in court as the inmate he knew as "Platinum."

¶22 Evidence is material if it is probative of a matter at issue. State v. Becker, 51 Wis. 2d 659, 677, 188 N.W.2d 449 (1971). Evidence that is probative of a matter at issue can be excluded on certain grounds, including that it is cumulative of already presented evidence,[18] but that decision is one the circuit court has discretion to make and is subject to highly deferential review on appeal.[19]

---

[16] We note that Gonzalez did not make a contemporaneous objection to the relevance of the evidence, and he does not make a claim that the potential prejudice outweighs the evidence's probative value under Wis. Stat. § 904.03.

[17] Pet'r's Br. 9.

[18] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Wis. Stat. § 904.03 (2013-14). All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[19] "The question on appeal is . . . whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record." State v. Wollman, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979). "An appellate court will not find an abuse of discretion if the record shows that the circuit court exercised its discretion and that there is a reasonable basis for the court's determination." State ex rel. M.L.B. v. D.G.H., 122 Wis. 2d 536, 542, 363 N.W.2d 419 (1985).

¶23 Gonzalez's approach would appear to require us to hold that once any evidence serves the purpose of identification, any additional evidence offered to corroborate it would be immaterial. This case turned on identification, and the State, which is held to a high burden of proof, was entitled to corroborate the identification of the defendant by any permissible means within the ordinary constraints of evidence law and subject to the discretion of the circuit court. It is simply untenable to assert that a central piece of identifying evidence is not material in a case like this. As the State notes, the relevance of the evidence was great in a case where "the identity of the assailant remained the central issue in dispute." Given the heavy burden the State bears in a criminal prosecution, it is inappropriate to limit otherwise admissible evidence on the grounds claimed here.

## IV. CONCLUSION

¶24 We hold that the evidence of Gonzalez's platinum teeth was physical evidence that does not have a testimonial aspect sufficient to implicate constitutional protections. The relevant question under the case law is whether the evidence in question expresses, makes use of, reveals, or discloses the contents of the defendant's mind. Teeth do not do so. We also hold that Gonzalez's teeth are material to identification because they are probative of Gonzalez's identity, which was a matter at issue. This case therefore fits squarely into the long-recognized category of cases involving the body as

17

evidence, and does not offend constitutional principles against self-incrimination.  We therefore affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶25 SHIRLEY S. ABRAHAMSON, C.J. *(concurring).* I join this opinion.

¶26 I write separately because this is one of the first opinions written and mandated under a new procedure in this court for circulating and mandating opinions. This case turns out to be a good case to test our new procedure: It is a unanimous opinion presenting one issue.

¶27 In keeping with this court's longstanding commitment to transparency and open government and "for the advice of counsel practicing in the Supreme Court and for information to the public,"[1] this court has published its internal operating procedures since 1984. This practice of openness and transparency should be continued.[2]

¶28 The Internal Operating Procedures presently set forth our procedure for the preparation and mandate of a draft opinion as follows:

> **II.F. ASSIGNMENT OF CASES** . . . After the cases are assigned, the justice prepares a draft opinion for circulation to the court.

> **G. OPINION** To place a draft opinion on the conference agenda, a justice must circulate his or her draft

---

[1] Introduction, Wisconsin Supreme Court Internal Operating Procedures, printed in volume 6 of the Wisconsin Statutes (2011-12), available at http://www.wicourts.gov/sc/IOPSC.pdf (last visited Nov. 25, 2014).

[2] The present Internal Operating Procedures "describe the manner in which the Supreme Court currently processes, considers and decides judicial matters brought to the court." Wisconsin Supreme Court Internal Operating Procedures, Introduction, available at http://www.wicourts.gov/sc/IOPSC.pdf (last visited Nov. 25, 2014).

1

opinion at least seven calendar days prior to the conference. Justices are encouraged to submit objections or suggestions in writing to the author, with copies to all justices prior to the conference.

The court considers each draft opinion carefully as to language and substance, and if there are any changes to be made that are of more than minimal importance, the opinion is recirculated and reconferenced. Any justice, whether in the majority or dissent, may at any time prior to the issuance of the mandate ask that an opinion be held and reconferenced.

Each justice who elects to write an opinion concurring in or dissenting from the court's opinion ordinarily announces that intention at an opinion conference. The author of a concurring or dissenting opinion and a justice who has asked that an opinion be held should give first priority to the concurring or dissenting opinion and to the opinion being held. Justices must circulate concurring or dissenting opinions and remove the hold on any opinion before circulating opinions in cases assigned to them. Any justice may reconsider his or her vote on the court's decision or opinion until the decision is mandated.

. . . .

**I. MANDATE** The court's decision in a case is mandated promptly upon approval of the opinion by the court and upon notification by the chief justice to the clerk. The court's opinion is issued simultaneously with any concurring or dissenting opinions.

When a decision is ready to be mandated, the court's opinion, along with any concurring or dissenting opinions, is transmitted to the clerk's office where it is reviewed and assigned a public domain citation. The case name and number of opinions that are scheduled for release are ordinarily posted on the court's website two days prior to the scheduled release date. On the day of mandate, the clerk's office telephones the attorneys for the parties, notifying them of the court's decision,[3] releases the

---

[3] In practice, the parties' attorneys are no longer notified by telephone now that opinions are posted to the court's website.

2

opinion to the parties and makes copies of the opinion available for public inspection. The opinion is also posted to the court's website. The opinion remains subject to further editing and modification. The office of the clerk arranges for the publication of the final version of the opinion in the official publications.

¶29 The new procedure was adopted on September 25, 2014, by a divided court.[4] In adopting this new procedure, regrettably (in my opinion) the court did not consider the court's Internal Operating Procedures (published in volume 6 of the Wisconsin Statutes); did not give notice to or seek comments from the bench, bar, or public; and did not consult the practices of other state courts.

¶30 A verbatim statement of the new procedure for opinion preparation and mandate is as follows:

FIRST: Within 10 days after the first circulation of a majority opinion, each justice shall declare by email to all justices participating in the case in one of four ways: (1) joining the opinion; (2) joining the opinion if specifically described changes are made; (3) concurring; or (4) dissenting.

SECOND - MAJORITY OPINION: Within 10 days of receiving a request for specifically described changes, the author of the majority opinion shall consult among members of the majority to determine whether some or all of the specifically described changes are acceptable. If some or all are acceptable, the majority opinion shall be revised and recirculated within 14 days after the initial 10 day consultation period. If some or all of the specifically described changes are not acceptable to the majority who support the first circulation, the justice whose changes were not accepted shall declare

---

[4] Justices Crooks, Roggensack, Ziegler, and Gableman voted in favor of adopting this procedure. Justices Bradley and Prosser and I dissented.

by email that he or she joins the majority opinion, notwithstanding the lack of changes that were requested, or that he or she will write separately. A justice who asked for changes in the majority opinion and does not join the majority opinion shall declare a concurrence or dissent and circulate his or her separate writing within 21 days of circulation of the revised majority opinion or the determination that the majority opinion will not be revised to meet his or her request whichever occurs first.

SECOND - SEPARATE WRITINGS: Whether concurring or dissenting, a justice who declares a separate writing in response to the first circulation of a majority opinion has 30 days after the justice's declaration to circulate his or her separate writing. No new majority opinions shall be circulated by justices who are writing separately.

THIRD: Upon circulation of a separate opinion, the author of the majority opinion has 14 days in which to revise, and upon receipt of those revisions, dissents and concurrences have 14 days to respond to the majority's revision. The revision of dissents and concurrences shall not create a new opinion, but shall respond only to revisions in the majority opinion. (In the past, some justices circulated cursory separate opinions in order to be able to circulate another majority opinion and then extensively revised the separate opinion, creating unnecessary delay. We are attempting to prevent this delay-causing practice by limiting the revisions to separate opinions.)

Upon recirculation of the majority opinion and recirculation of the separate writings, each justice shall, within 10 days, by email to all justices participating in the case make a final declaration of which opinion he or she is joining. If during this process the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the "lead opinion." If a separate writing garners the vote of a majority of the court thereby changing the mandate of the opinion, it shall be revised as the majority opinion within 14 days of the vote of the court. During that same 14 day period, other separate writings shall be revised to indicate their status as concurrences or dissents to the new majority opinion. The majority opinion and

4

the separate writings shall be mandated upon final declaration.

Within 5 days of mandate, the majority opinion shall be placed in the release drive; within 5 days after that event, the separate writings also shall be placed in the release drive for transmittal of all writings to the clerk's office for release to the public, unless release of separate writings is delayed as required by step "FOURTH" below.

FOURTH: If during the course of a separate writing, the author cites to a case then pending before us for which the opinion of the court has not been released, the majority opinion shall be released with the designation, "separate opinion(s) to follow," unless the citation can be replaced with ellipses in which case the separate opinion shall be released with the majority opinion and the ellipses shall be replaced with the omitted citation when the cited opinion is released. There shall be no further changes to the separate writings after mandate. Separate writings for which the citation cannot be replaced with ellipses shall be released when the then unreleased decision that was cited in the separate opinion is released.

FIFTH: No one justice may block the release of a majority opinion by a "Hold." It shall take the affirmative vote of the majority of participating justices to block the release of a majority opinion. No one justice may tie together the release of two pending cases. It shall take the affirmative vote of a majority of participating justices in each case to tie together the release of two pending cases.

SIXTH: Majority opinions assigned in September, October and November shall be circulated no later than January 31. Majority opinions assigned in December, January and February shall be circulated no later than March 31. Majority opinions assigned in March and April shall be circulated no later than May 31.

There will be no court conferences on circulated opinions unless a majority of justices participating in the case request court conference on the circulated opinion(s) in that case.

5

The times for responding to majority opinions first circulated after April 15 will need to be shortened from what is set forth above. We will make a decision about what timelines are needed during April 2015 when we see how many opinions remain outstanding.

There also may need to be some flexibility when applying this process to the opinions due by January 31 and March 31. Flexibility may be needed generally because this is a new process. It is anticipated that if a justice has tried but cannot meet the expected deadlines, he or she will request an extension for a specified time so all will understand where the court is in opinion processing and release.

¶31 The flow chart accompanying the narrative is as follows:

The following is a flow chart representing the revised Opinion Preparation & Mandate proposal. For clarity, the chart is broken into two separate pieces: the first, directly below, represents the process for initial circulations of all opinions; the second, on page two, represents the process from circulation of all opinions through revisions and mandate.





General notes:

All deadlines are calendar days.

• The <u>maximum</u> time under this proposal from first circulation of a majority opinion to mandate is 107 days. This assumes that all maximum time is taken and each of the following occurs:

> • A Justice does not declare a concurrence or dissent until after the majority has been recirculated and incorporated suggested changes; and

> • The majority flips, triggering the additional 14 day revision period.

• The five day periods for placing opinions in the Release Drive following mandate are for cite checking and spelling and grammar revisions.

¶32 Key portions of the Internal Operating Procedures (which we have generally followed since before 1984 up until September 2014) are as follows: All opinions were discussed in conference, often several times; any justice could ask that a draft opinion be held and reconferenced; and majority opinions would be released simultaneously with any concurring or dissenting opinions.

¶33 The new procedure departs from our longstanding procedure for opinions and mandates in several important ways. Starting in September, draft opinions cannot be discussed at conference. To hold a conference on a draft opinion, a vote of four justices is required. No single justice can hold an opinion; a vote of four justices is required. Furthermore, in certain circumstances a majority opinion may be released without being accompanied by a concurring or dissenting opinion; the drafted concurring and dissenting opinions must be released at a

later date. These provisions, as well as the short time periods allowed for separate writings, are unwelcoming to concurrences and dissents.

¶34 Ambiguities and cracks in the process have already appeared. Some were identified during the adoption of the new procedure, others not.

¶35 Changing the ways the court does its business is important. Circumstances change, personnel changes, and technology changes. Timely release of our opinions after oral argument is important for the litigants, for the bench and bar, for the public, and for this court. We should not, however, sacrifice thoughtful discussion and careful collegial review of draft opinions just for the sake of speed. For at least the last 50 years, cases heard from September 1 through June have been completed by June 30 (unless additional briefing was required), regardless of the procedure used for circulating and mandating opinions.

¶36 Only time will tell whether this new procedure will produce thoughtful, precise opinions that are released more promptly, or whether it will even produce opinions that are released more promptly. At this time, we are encountering the ambiguities and uncertainties of the procedure and the different timelines for numerous circulating opinions (some addressing similar issues). Figuring out due dates and maintaining a flow chart for each draft opinion is unwieldy and difficult because of ambiguities in calculating time periods and numerous redrafts that are not accounted for in the narrative or flow chart.

10

¶37 Changes in the newly adopted procedure are being requested and should be given serious consideration. Improvements may make this experimental new procedure more satisfactory.

¶38 The court might even consider a simpler procedure to accomplish the goals of reducing conferences and establishing deadlines. For example, there might be an initial conference discussion of a draft opinion to identify the areas of strength and weakness, to identify areas of agreement and disagreement, and to determine whether opinions involving the same legal issues need to be put on the same timeline for harmonization. Deadlines might be established at this conference for each opinion to fit the circumstances, such as the extent of revisions required, the number and approaches of separate writings, and the work of the court and the individual justices.

¶39 There may be other and better suggestions for the court to consider.

¶40 For the reasons set forth, I write separately.