COURT OF APPEALS
DECISION
DATED AND FILED

June 6, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP952-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF909

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

TODD ALLEN KENDHAMMER,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for La Crosse County: TODD W. BJERKE, Judge. *Affirmed*.

Before Kloppenburg, P.J., Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Todd Kendhammer was convicted, following a jury trial, of first-degree intentional homicide of his wife, Barbara Kendhammer, and sentenced to life in prison with eligibility for parole after 30 years. Kendhammer appeals the judgment of conviction and the circuit court's order denying his motion for postconviction relief. On appeal, Kendhammer renews certain aspects of the arguments that he made in his motion. Specifically, Kendhammer argues that his trial attorneys were constitutionally ineffective in four respects: (1) failing to object to the circuit court's order that jurors be identified only by their first names and juror numbers; (2) failing to investigate and present testimony from a defense forensic pathologist; (3) failing to investigate and present testimony from an expert psychologist concerning memory and trauma; and (4) failing to introduce evidence relating to the theory that a metal pipe bounced on the road after falling off a passing truck on the highway, penetrated the windshield of Kendhammer's car, and caused the injuries that led to Barbara's death. Kendhammer further argues that he is entitled to a new trial in the interest of justice because the real controversy was not tried as a result of his trial attorneys' asserted errors. We reject Kendhammer's arguments and, therefore, we affirm.

## BACKGROUND

¶2     On the morning of September 16, 2016, police officers responded to a 911 call from Kendhammer, who reported that he and Barbara had been driving when a pipe that fell off a truck pierced the windshield and struck Barbara, severely injuring her. Barbara was transported to a hospital and died the next day. The State subsequently filed a criminal complaint charging Kendhammer with first-degree intentional homicide. After nine days of trial and ten hours of deliberations, the jury found Kendhammer guilty as charged.

¶3 Kendhammer filed a motion for postconviction relief in the circuit court in February 2021. The court held an evidentiary hearing on the motion over the course of three days in August 2021 and, after additional briefing, denied the motion in a comprehensive and detailed written decision. Kendhammer appeals.

## DISCUSSION

¶4 Kendhammer argues that his trial attorneys provided constitutionally ineffective assistance in four respects. We first state the general legal principles and standard of review that apply to ineffective assistance of counsel claims, and we then address Kendhammer's claims in turn.

¶5 The Sixth Amendment of the United States Constitution guarantees a criminal defendant's right to effective assistance of counsel. U.S. CONST. amend. VI; *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95. The Wisconsin Constitution similarly provides the right to effective assistance of counsel. WIS. CONST. art. I, § 7; *see also State v. Sanchez*, 201 Wis. 2d 219, 226, 548 N.W.2d 69 (1996) (concluding that the right to counsel under the Wisconsin Constitution is "substantially similar" and "interpreted identically" to the Sixth Amendment right to counsel).

¶6 A defendant claiming ineffective assistance of counsel must establish that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[T]here is no reason for a court deciding an ineffective assistance claim … to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697; *see also State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93 ("If the defendant fails to satisfy either prong [under *Strickland*], we need not consider the other."). The defendant bears

the burden on both of these prongs. *State v. Roberson*, 2006 WI 80, ¶24, 292 Wis. 2d 280, 717 N.W.2d 111.

¶7 We resolve this appeal based on the lack of a showing on the deficient performance prong. To establish that counsel's performance was deficient, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. The question is whether, in light of all the circumstances, identified acts or omissions by counsel "amounted to incompetence under 'prevailing professional norms,' not whether [the acts or omissions] deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citation omitted). A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

¶8 In other words, we give substantial deference to trial counsel's decisions, provided they are objectively reasonable and strategic, and do not conduct our review with "the benefit of hindsight." *State v. Mull*, 2023 WI 26, ¶35, 406 Wis. 2d 491, 987 N.W.2d 707 (quoting *Pico*, 382 Wis. 2d 273, ¶22). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that

reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.

¶9 We review a claim of ineffective assistance of counsel as a mixed question of fact and law. *State v. Manuel*, 2005 WI 75, ¶26, 281 Wis. 2d 554, 697 N.W.2d 811 (citing *State v. Erickson*, 227 Wis. 2d 758, 768, 596 N.W.2d 749 (1999)). "A circuit court's findings of fact will not be disturbed unless they are clearly erroneous." *State v. Ward*, 2011 WI App 151, ¶9, 337 Wis. 2d 655, 807 N.W.2d 23. "Findings of fact include 'the circumstances of the case and the counsel's conduct and strategy.'" *State v. Thiel*, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted). The court's "legal conclusions as to whether the lawyer's performance was deficient and, if so, prejudicial, are questions of law that we review de novo." *Ward*, 337 Wis. 2d 655, ¶9.

## 1. Limiting Juror Identification to First Name and Juror Number at Trial

¶10 Kendhammer argues that his trial attorneys were constitutionally ineffective by failing to object to the circuit court's order to refer to the jurors by their first names and juror numbers.[1] We reject Kendhammer's argument because the record demonstrates that the order satisfied the requirements that apply to orders that restrict juror information. Therefore, any objection would have lacked merit. *See State v. Toliver*, 187 Wis. 2d 346, 360, 523 N.W.2d 113 (Ct. App.

---

[1] In his statement of issues, Kendhammer asserts that the circuit court's order violated his right to due process and the presumption of innocence. However, he did not make a contemporaneous objection to the order. A defendant forfeits the right to appellate review of alleged errors in the jury selection process absent a contemporaneous objection in the circuit court. *See State v. Erickson*, 227 Wis. 2d 758, 765-67, 596 N.W.2d 749 (1999). Consistent with this case law, Kendhammer argues, and we address, this issue solely within the framework of an ineffective assistance of counsel claim. *See id.* at 768.

1994) ("trial counsel was not ineffective for failing or refusing to pursue feckless arguments").

¶11     As stated, the circuit court's order required that, during trial, counsel refer to jurors by their first names and juror numbers.  As a result, the jurors' last names were withheld from the trial record.  The restriction of juror information implicates "a defendant's rights to an impartial jury and a presumption of innocence."  *State v. Tucker*, 2003 WI 12, ¶19, 259 Wis. 2d 484, 657 N.W.2d 374.  To protect those rights, our supreme court has set forth the following two-prong test that must be satisfied when a circuit court restricts or withholds "any" juror information.  *Id.*, ¶¶17, 19.  The court must (1) make an individualized determination that the jurors need protection and (2) take reasonable precautions to minimize any prejudicial effect to the defendant.  *Id.*, ¶4.[2]  Pertinent here, the court may consider various factors in determining whether a jury needs protection, including whether the case involves extensive publicity that could increase the possibility that jurors' names would become public and expose them to intimidation or harassment.  *Id.*, ¶22.

---

[2] The State in its brief erroneously states the law set forth in *State v. Tucker*, 2003 WI 12, ¶19, 259 Wis. 2d 484, 657 N.W.2d 374.  Specifically, the State asserts that the two-prong test articulated in *Tucker* does not apply here because the jury was not "anonymous," inasmuch as the jurors' first names were used on the record.  However, the State's citation to *Tucker* provides no support for its assertion.  To the contrary, our supreme court in *Tucker* expressly extended the due process protection provided by courts' application of the two-prong test in cases involving anonymous juries—meaning that identifying juror information is withheld from both the public and the parties—to cases in which "any juror information" is restricted in open court.  *Id.*, ¶¶10-19.  The State acknowledges that here the circuit court prohibited the parties from referring to the jurors by their last names during trial.  Thus, it is undisputed that the court "restricted" or "withheld" some juror information as those terms are used in *Tucker*.  *Id.*, ¶¶4, 17, 19.  Therefore, the two-prong test that the court in *Tucker* ruled applies whenever a court "restricts" or "withholds" "any juror information," applies here.  *Id.*

¶12     We review a circuit court's decision to restrict juror information for an erroneous exercise of discretion. *Id.*, ¶20.  A court properly exercises its discretion if it engages in "a reasoning process that considers the applicable law and the facts of record, leading to a conclusion that a reasonable judge could reach." *Id.*, ¶10.

¶13     Here, before trial, the circuit court sent each potential juror a questionnaire on which the juror provided, among other things, the juror's full name, address, and other identifying information.  Counsel had unrestricted access to the questionnaires and the jurors' information before and during trial.  Shortly before trial commenced, the court informed counsel that the trial would be available to the public via live streaming on two television networks. Accordingly, the court directed, among other things, that "[d]uring voir dire counsel will refer to the jurors by their first name[s] and seat position[s] (number 1 through 29), to prevent their identities from becoming public due to the media coverage of this trial."  Before the start of voir dire, in response to a question from one of Kendhammer's attorneys, the circuit court clarified that the jurors were to be called by their first names and juror numbers "in lieu of their last name[s]." When the prospective jury pool was seated in the courtroom, the court told the prospective jurors, "We'll call the name for the record.  It's just your first name and juror number."  Before the court and counsel began their questioning of the prospective jurors, the court again told the jurors that it was asking that counsel "identify for the record any juror who responds to any question of them by their first name and either their seat number or juror number."

¶14     We agree with the circuit court that its order satisfies the *Tucker* two-prong test.  In its decision denying Kendhammer's postconviction motion, the court made the following findings.  Counsel had complete access to the jurors'

personal information, including their full names, before and during trial. The case had generated considerable media attention, and it was necessary to protect the jurors "from potential interference related to publicity and harassment" as a result of both the pretrial media attention and live media coverage of the trial. The order required that counsel refer to jurors by their first names and juror numbers in order to provide that protection, and expressly explained to counsel the reasoning for the order: "to prevent [the jurors'] identities from becoming public due to the media coverage of this trial." The court also instructed the media not to photograph or video any juror during the trial. The jurors could see the cameras used by the media in the courtroom. Based on these findings, the court determined that Kendhammer was not prejudiced by the withholding of only the jurors' last names on the record during trial. We conclude that the court properly exercised its discretion when it made an individualized determination that the jury needed some protection due to the extensive media coverage before and during trial, and minimized any prejudice to Kendhammer by providing that protection through the withholding of only the jurors' last names during trial. Accordingly, his trial attorneys were not ineffective for failing to object to the court's order.

¶15 Kendhammer argues that an objection would have been meritorious because the circuit court did not satisfy either prong of the *Tucker* test. This argument fails because it is based on the faulty premise that the court's order required a "numbers jury," meaning that the jurors' full names were withheld at trial and the jurors were referred to by number only. *See id.*, ¶¶2, 11. Kendhammer fails to take into account that the order required only that the last

names of the jurors be withheld.[3] Accordingly, his argument fails to address the court's exercise of discretion as to both prongs based on the limited nature of the restriction here.

¶16     Even had Kendhammer accurately characterized the circuit court's order as withholding only the jurors' last names, he fails to show that the court erroneously exercised its discretion so that a hypothetical objection would have been meritorious.  As to the first prong, Kendhammer argues that the court's reference to "media coverage" without more elaboration was insufficient to constitute an individualized determination that the jury needed protection.  However, as the circuit court explained, that reference encompassed both the extensive pretrial media coverage of the case as well as the continued media coverage of the trial through live streaming by two television networks.  The court explained that, as a result, it determined that the jury needed some protection from the "potential interference related to publicity and harassment."  The record establishes that the court made an individualized finding that the jury needed "some" protection.  *See id.*, ¶22 (noting that an individualized determination that a jury needs protection may be supported by a finding that there is extensive

---

[3] In his reply brief, Kendhammer appears to assert that the circuit court told counsel at trial to refer to jurors by their numbers only.  However, the portion of the record to which Kendhammer cites in support of this assertion contains the court's remarks to the prospective jurors quoted above, in which the court told the jury that it asked counsel "to identify for the record any juror who responds to any question of them by their first name and either their seat number or juror number."  Accordingly, the record confirms that this case does not involve a "numbers jury."

publicity that could increase the possibility that jurors would be exposed to intimidation or harassment).[4]

¶17    As to the second prong, Kendhammer argues that the circuit court was required, but failed, to give a "precautionary jury instruction to ensure that use of an anonymous jury would not negatively reflect on [his] guilt or character." However, the second prong requires that the court "take reasonable precautions to minimize any prejudicial effect to the defendant[.]" *Id.*, ¶27. The court here explained that requiring the withholding of only the jurors' last names during a trial that had been preceded by extensive pretrial media coverage and that the jurors could see was being live streamed, sufficed to protect the jurors from potential intimidation without prejudicing Kendhammer. Given the extensive pretrial media coverage and the visibility of the network cameras in the courtroom during the trial, the court reasonably determined that the jurors could infer from these facts that the withholding of their last names at trial was connected to the media presence and the jurors would not interpret such restriction as a reflection of Kendhammer's guilt or character. Kendhammer fails to show that the court did not take reasonable precautions to minimize any prejudice to him in these circumstances.

---

[4] Kendhammer also argues that the circuit court was required to find that there was "a strong reason" to believe that the jury needed protection, and that the court failed to articulate such a reason. Kendhammer cites *Tucker* as imposing this requirement, but such a requirement does not appear in either the portion cited or any other portion of the opinion. In the portion cited, our supreme court noted that this court had in an earlier opinion framed the first prong of the two-prong test as requiring that the circuit court find "a strong reason to believe that the jury needs protection." *Tucker*, 259 Wis. 2d 484, ¶15 (citing *State v. Britt*, 203 Wis. 2d 25, 34-36, 553 N.W.2d 528 (Ct. App. 1996)). However, the court in *Tucker* repeatedly reframes that prong as requiring that the circuit court make an "individualized determination that the jury needs protection." *Tucker*, 259 Wis. 2d 484, ¶¶4, 17, 19, 27. As explained in the text, the circuit court did just that here.

## 2. Failure to Consult and Call a Forensic Pathologist

¶18    Kendhammer argues that his trial attorneys were constitutionally ineffective for failing to investigate and call as an expert witness a forensic pathologist to counter the testimony of the State's forensic pathologist that Barbara's injuries were intentionally inflicted and not accidentally sustained.  This argument fails because the record establishes that his trial attorneys had a reasonable strategy for not doing so.  Therefore, Kendhammer does not prove deficient performance.

¶19    The State's theory at trial, in pertinent part, was that Kendhammer intentionally inflicted the injuries of Barbara's head and neck that killed her.  The defense theory at trial, in pertinent part, was that the injuries resulted from an accident when a metal pipe penetrated the windshield and Barbara hit her head as she ducked.  Specifically, Kendhammer testified at trial that he saw the pipe, which he at first thought was a bird, coming towards the windshield, he lunged forward, the pipe came through the windshield, Barbara started flailing, he pulled over to the side of the road, he got the pipe "out of the way" as he tried to get Barbara's limp body out of the car, they both fell on the ground as he pulled her out, he gave her CPR, and he called 911.  Both sides presented expert witnesses who testified at trial as to their opinions regarding the nature and cause of the injuries that Barbara sustained from the incident.

¶20    Dr. Kathleen McCubbin, the forensic pathologist who performed the autopsy on Barbara three days after Barbara died (four days after the incident), testified on behalf of the State regarding the injuries that Barbara sustained. McCubbin testified that "[t]he cause of Barbara Kendhammer's death was blunt impact injuries of her head and neck."  McCubbin testified that she did not see any

injuries or evidence of a pipe striking Barbara's head or impaling her. McCubbin further testified that the injuries Barbara sustained could not be from "a single impact from a pipe" because that "could not account for the multitude of injuries" on Barbara's body. McCubbin testified that she could not say how some of those other injuries occurred. McCubbin testified that some of those other injuries were consistent with strangulation, and some were consistent with "someone who was using their hands in a way to defend themselves." McCubbin testified that the injuries she reviewed as a basis for her opinions did not include injuries related to medical care Barbara received before she died or injuries related to the donation of Barbara's organs, skin, and bones after she died.

¶21 Dr. Barry Bates, an expert "in the area of human performance and biomechanics and some statistics," testified for the defense at trial regarding the head, nose, and neck injuries that Barbara sustained. Bates testified that those injuries and the resulting death were caused by Barbara being struck by a pipe penetrating the windshield, and testified as to the sequential mechanics of how the injuries occurred. More specifically, he testified that Barbara likely ducked when the pipe came towards her and then the pipe struck and skipped across her head, causing the injuries to the back of her head. On cross-examination, Bates testified that he lacked expertise in forensic pathology.

¶22 Dr. Steven Cook, a retired doctor who specialized in emergency medicine, with experience in treating victims of serious car accidents including when an object perforated a windshield, domestic violence, blows to the head, and homicide, also testified for the defense at trial regarding the nature and cause of Barbara's injuries. He testified that Barbara's injuries were "consistent with the accident as was described by Mr. Kendhammer." Cook testified that he agreed with McCubbin's testimony that not all of the injuries can be explained by a blow

12

from a pipe penetrating the car's windshield. He testified that Barbara's injuries were consistent with her having been struck unconscious by a pipe penetrating a windshield, her body's movements as the car pulled off the road, and her body being removed from the car. On cross-examination, Cook testified that he lacked expertise in forensic pathology.

¶23 At the hearing on Kendhammer's motion for postconviction relief, postconviction counsel presented the testimony of a forensic pathologist, and both of Kendhammer's trial attorneys testified. The forensic pathologist, Dr. Shaku Teas, testified that she had been a medical examiner in Illinois and is a consultant who has been called to testify as a trial expert in forensic pathology hundreds of times. She testified that Barbara died as a result of injuries of the skull and brain due to a car accident, consistent with Kendhammer's explanation that a pipe penetrated the windshield accidentally. She testified that other injuries, including most of the bruises and the rib fractures, were caused at the hospital and by the subsequent treatment and handling of the body, organ donations, and autopsy. She testified that she saw nothing on the body that was consistent with Barbara having been beaten or strangled. She also testified to flaws in McCubbin's autopsy procedure and findings.

¶24 As McCubbin, Bates, and Cook were subject to vigorous cross-examination at trial as to their missing facts, failure to explore alternate explanations, and limitations on their expertise and experience, so was Teas subject to similar vigorous cross-examination at the postconviction motion hearing.

¶25 Kendhammer's trial attorneys testified at the postconviction motion hearing as follows. They discussed before trial hiring either a forensic pathologist

or a traumatic injury expert, and determined that they could sufficiently cross-examine McCubbin and present their defense based on the testimony by Bates and Cook without also calling a forensic pathologist. They decided to call Bates and Cook as expert witnesses to counter McCubbin's testimony, based on those witnesses having expertise, experience, and approaches that differed from those of a forensic pathologist. As for Bates, he cross trained in engineering, physics, some medicine, and anatomy, and his perspective helped explain how a pipe penetrating the windshield could cause the injuries to Barbara's head and face. While Bates could not rebut McCubbin's testimony from a medical perspective, he did rebut her testimony from a biomechanical perspective.

¶26 As for Cook, in the trial attorneys' experience, juries are more persuaded by local doctors who are not career witnesses, and so in this case, the attorneys sought a local trauma physician who was not a career expert but a doctor who does not generally testify. The attorneys sought a doctor with expertise in traumatic injury, based on experience as an emergency room doctor, rather than a pathologist, and Cook had the necessary traumatic injury expertise and experience.

¶27 The circuit court found that Kendhammer's trial attorneys "employed [a] strategy" of presenting additional perspectives to explain the cause of Barbara's injuries consistent with an accident as described by Kendhammer, "rather than countering [McCubbin] within the same frame of reference of forensic pathology." The court also found that the trial attorneys "employed [a] strategy" of presenting a medical expert who was local and not a career trial expert, based on their experience with what proved most effective with juries. The court concluded that these strategic choices were reasonable and that, accordingly, the trial attorneys did not perform deficiently.

14

¶28    Kendhammer argues that it was unreasonable for his trial attorneys not to have consulted with a forensic pathologist, because, according to Kendhammer, Teas' testimony shows that had they done so they could have better highlighted the weaknesses in and rebutted McCubbin's testimony. However, demonstrating that another trial strategy "may look better in hindsight" does not cause the strategic choices of trial counsel to become unreasonable. *See Mull*, 406 Wis. 2d 491, ¶49; *see also State v. Harper*, 57 Wis. 2d 543, 556-57, 205 N.W.2d 1 (1973) ("In considering alleged incompetency of counsel, one should not by hindsight reconstruct the ideal defense."). Similarly, "[t]his court will not second-guess a trial attorney's considered selection of trial tactics or the exercise of professional judgment in the face of alternatives that have been weighed by trial counsel." *State v. Shade*, 2003 WI App 42, ¶15, 260 Wis. 2d 600, 658 N.W.2d 87.

¶29    As stated, the circuit court found that Kendhammer's trial attorneys made strategic choices to retain experts with different frames of reference from forensic pathology and to counter the testimony of the State's medical forensic pathologist with an expert who could provide a biomechanical explanation of how Barbara sustained her injuries, and a local medical doctor who could evaluate the injuries based on expertise in traumatic injury. The attorneys testified that they determined that those experts' opinions enabled them to both effectively cross-examine the State's forensic pathologist and present their defense. The record shows that the trial attorneys exercised their professional judgment and made reasonable strategic choices. Kendhammer essentially argues that his trial attorneys should have made what he believes were better choices. However, that is not the standard for the showing that he must make. In sum, Kendhammer fails

to demonstrate that his trial attorneys performed deficiently by failing to consult and call a forensic pathologist.[5]

### 3. Failure to Consult and Call a Memory Expert

¶30  Kendhammer argues that his trial attorneys should have presented an expert specializing in how memory is affected by trauma.  This testimony, Kendhammer says, would have explained why his description of the incident that resulted in Barbara's death was inconsistent and uncertain at different times throughout the police investigation and trial.  This argument fails because the record establishes that his trial attorneys had a reasonable strategy for not doing so.  Therefore, Kendhammer does not prove deficient performance.

¶31  Kendhammer's various statements to police and his testimony at trial about what took place immediately before and during the incident were inconsistent, and there were details he could not remember.  For example, he gave different reasons to the police and at trial for why he and Barbara were driving away from where Barbara worked that morning at a time when she was scheduled to already be at work.  At trial, Kendhammer testified that he had no explanation for why Barbara was going to be late for work that day.  Kendhammer told police

---

[5] Kendhammer cites four federal cases in support of his argument, but none are binding on this court and all are readily distinguishable and, therefore, not persuasive.  In three of the cases, defense counsel did not present any expert witnesses to counter the State's medical examiner's testimony. *Thomas v. Clemens*, 789 F.3d 760, 768 (7th Cir. 2015); *Dunn v. Jess*, 981 F.3d 582, 586 (7th Cir. 2020); and *Dunn v. Neal*, 44 F.4th 696, 701 (7th Cir. 2022).  In *Adams v. Bertrand*, 453 F.3d 428, 436 (7th Cir. 2006), defense counsel did not call any defense witnesses, or interview a potential exculpatory witness.  In contrast, here, as recounted in the text, Kendhammer's trial attorneys presented two expert witnesses, one with biomechanical and related expertise and one with medical traumatic injury expertise, to counter the State's forensic pathologist's testimony, and explained why they did so.

at various times that the pipe that penetrated the windshield fell off a truck. He also told police at various times, as he testified at trial, that he first thought that what he saw coming towards the windshield was a bird. He testified that he lunged forward to hit the windshield when he saw that it was a pipe. He testified that everything happened fast and he was not sure how he hit the windshield when he lunged forward or whether he hit the windshield with both hands or only one hand, or how he ended up in a ditch 600 feet down the road.

¶32     The State's theory, in pertinent part, was that Kendhammer's inconsistent versions and uncertain recollection of events surrounding the incident showed that he fabricated the story of an accident. The defense theory, in pertinent part, was that Kendhammer's memory of the events was inhibited by the extraordinary trauma of seeing his beloved wife die.

¶33     Dr. Bates, the defense's trial expert in biomechanics and human performance, testified about memory and its limitations. He testified that he had developed his expertise in memory from reading and studying research literature. He testified that short-term memory is temporary and "very prone to problems" when placed into long-term memory. He testified that what is put into long-term memory is affected by "past experiences and what's already in your memory" to fill in gaps, and by stress and time, often leading to inaccuracies.

¶34     At the postconviction motion hearing, Kendhammer's postconviction counsel presented a report and testimony by a memory expert, Dr. Geoffrey Loftus, a professor at the University of Washington, who had testified 475 times. He testified how questionable "post-event information" is unconsciously added to what the person experienced at the time ("conscious experience information") to form the person's eventual memory of the event. He

17

testified that the filtering out of details outside of the "spotlight" of a person's attention, high stress, and the limited time to perceive during an event ("functional duration"), all applicable to the event described by Kendhammer, can adversely affect the formation of memory, and did likely adversely affect the accuracy of Kendhammer's memory of the traumatic event he described here. Loftus testified that the nature of post-event questioning can also affect memory. He also testified how all of these factors could have adversely affected the memory of a witness who testified that, when he drove by Kendhammer's car at a time that was shortly after it ended up in the ditch, he did not see any hole in the windshield.

¶35 Kendhammer's trial attorneys testified that they determined that Bates was qualified to offer testimony on memory, even though his expertise was more limited than that of an expert solely on memory, and that he sufficiently covered memory and the impact of trauma on memory for purposes of their defense.

¶36 The circuit court found that Kendhammer's trial attorneys made a strategic choice to educate the jury on some of the problems with memory through Bates' testimony rather than calling a separate memory expert, and determined that that choice was reasonable and within prevailing professional norms. The court therefore concluded that the trial attorneys did not perform deficiently.

¶37 Kendhammer argues that the testimony by an expert in memory and trauma would have helped in at least three respects. It would have helped the jury understand how the trauma of the incident here affected Kendhammer's memory about details that were tangential to Barbara's injuries and how post-event information was incorporated into his memory. It also would have helped the jury understand how the memory of the witness who drove by the car shortly after it

went in the ditch and testified that he saw no damage to the windshield was inaccurate. Finally, it also would have helped dispel the misconceptions about memory that the prosecutor in his closing arguments told the jury showed Kendhammer was lying.

¶38 We agree with the circuit court that Kendhammer's trial attorneys made a reasonable strategic choice to use Bates to "educate the jury" about the adverse effects on memory of stress, the passage of time, and the filling in of gaps based on experience. Kendhammer's trial attorneys highlighted those effects in their own closing arguments to counter the prosecution's arguments that Kendhammer's inconsistent statements and failure to recall details showed that he was lying, and to question the accuracy of the passing witness's testimony. Kendhammer's assertions on appeal amount to the argument that the better choice would have been to retain a memory expert who would have provided more detailed information to the jury. However, as explained above, that is not the standard for showing deficient performance. In sum, Kendhammer does not show that his trial attorneys performed deficiently by failing to consult and call a memory expert.

## 4. Failure to Present Evidence Related to the Pipe

¶39 Kendhammer argues that his trial attorneys should have: introduced evidence that he first told officers that he heard a loud bang and that the pipe bounced off the road; shown videos of the State's "pipe-drop" tests; and introduced evidence that trucks commonly hauled metal pipes on the road on which the incident occurred, County Highway M. As we explain, we conclude that Kendhammer fails to show that his trial attorneys performed deficiently in these three respects.

¶40    As stated, Kendhammer argues that his trial attorneys should have presented evidence showing that Kendhammer told officers that he heard a loud bang and that the pipe bounced on the road before penetrating the windshield. Kendhammer points to two exhibits that his postconviction counsel presented at the postconviction motion hearing:  (1) an incident report prepared on the day of the event by the first officer to respond, reporting that Kendhammer said that he "heard a loud bang and observed a pipe coming through the windshield" and that the pipe came off "an older … flatbed type truck"; and (2) a motor vehicle accident report prepared by another officer who arrived soon after the first responding officer, reporting that Kendhammer said that he was traveling northbound on County Highway M when a flatbed truck traveling southbound lost an 83-inch metal pipe, which "bounced off the roadway and impaled the front windshield."  This evidence, Kendhammer asserts, would discredit the State's sole reliance on Kendhammer's subsequent statements to officers that the pipe went directly from the flatbed truck through the windshield.  As argued by Kendhammer, the State presented witnesses who testified that the latter version was physically impossible, and the former version, that the pipe bounced before penetrating the windshield, would offer a viable alternative.

¶41    At trial, Kendhammer's trial attorneys did not ask the officer who prepared the incident report (who testified for the State) about Kendhammer's "heard a loud bang" statement, and did not call the officer who prepared the accident report and question him about Kendhammer's "bounced off the truck" statement.

¶42    At the postconviction motion hearing, Kendhammer's trial attorneys testified as follows.  They did not call attention to Kendhammer's different statements of whether the pipe bounced off the road or flew directly from the

flatbed truck to the windshield because they did not want to assume the burden of proving how the incident happened, because it was the State's burden. They chose not to tell the jury how it happened because they could not prove how it happened, and if the jury did not believe the defense theory of how it happened, that would adversely affect their client ("There's a difference between saying the State hasn't proved to [the jury] what's happened and saying this is how it happened."). They decided to avoid highlighting inconsistencies among Kendhammer's statements, and instead to focus on the fact that, when Kendhammer spoke to the first responding officers at the scene, he was very emotional and understandably did not remember all of the details correctly. Their defense theory was that regardless of whether the pipe came from a truck and bounced or not, or whether the pipe had fallen off a vehicle and was left lying on the road and was thrown up into the air, it was an accident, as Kendhammer consistently stated to police and testified at trial.

¶43     The circuit court found that Kendhammer's trial attorneys chose to focus at trial, through their questioning of Kendhammer, on how he was traumatized at the time of the incident, rather than "pigeonholing him into a story of whether the pipe bounced or not." The court concluded that, in choosing this strategy, Kendhammer's trial attorneys did not perform deficiently.

¶44     The record establishes that Kendhammer's trial attorneys made a deliberate strategic decision: not to assume the State's burden of proof; not to present an alternative that they could not prove and that the jury could have rejected; and not to highlight his inconsistent statements except to show that he was too traumatized at the time to recollect the details of what had just happened. We conclude that this decision was reasonable. Accordingly, Kendhammer does not show that his trial attorneys performed deficiently by failing to present

21

evidence that he initially told officers that he heard a loud bang and that the pipe bounced before it penetrated the windshield.

¶45    Kendhammer next argues that his trial attorneys should have introduced video recordings of the State's "pipe-drop" tests. At the postconviction motion hearing, Kendhammer's postconviction counsel presented as exhibits the videos of the tests, and reports explaining that the videos showed nine tests of a truck driving on the same stretch of road as where the incident took place and dropping a similar pipe to the pipe found at the scene from trucks with various heights and going at various speeds. According to the reports, the "purpose of this testing was to determine the flight pattern and the different paths a pipe would take at different truck heights and speeds with a pipe matching the one that was involved" in the incident. Kendhammer's postconviction counsel also presented as an exhibit an affidavit by a crime scene reconstruction expert who averred that in one of the nine tests, "the pipe bounced and torqued in a manner that almost aligned with penetration of the passenger side of the windshield of an oncoming car, as generally described by the defendant in this case." The expert averred that this test showed that "a pipe falling from an oncoming truck might have penetrated the passenger side of the windshield as the defendant stated." Kendhammer argues that evidence of these tests could have rebutted the State's theory that the falling pipe story was physically impossible and, therefore, that Kendhammer was lying. Kendhammer further argues that his trial attorneys' failure to present evidence of these tests "deprived the jury of a reasonable hypothesis consistent with the defendant's innocence."

¶46    At the postconviction motion hearing, Kendhammer's trial attorneys testified that they did not present evidence of the pipe-drop tests because the tests did not follow scientific methods, lacked a scientific basis, and were based "on a

false premise." The trial attorneys testified that there was no evidence showing that a flatbed truck carrying a pipe existed, how high the bed of the truck was, how fast the truck was going, or how exactly the pipe came through the windshield (either from the truck or from the roadway). Thus, the attorneys testified, to focus on the methodology of the tests would be misleading. They testified that it would also have invited questioning about inconsistencies in Kendhammer's statements to police and testimony at trial.

¶47 The circuit court found that the defense and the prosecution had agreed that neither side would present evidence of the pipe-drop tests at trial, because, as trial counsel testified, there were too many unknowns about how the pipe actually came through the windshield. As a result, to focus on the methodology used in the tests would have misled the jury. The court also found that, given that eight of the nine tests did not show a pipe falling off a truck and bouncing in a manner that would allow it to hit the windshield of an oncoming vehicle, the evidence "could be framed as showing how the circumstances described by [Kendhammer] could not be replicated," to the detriment of his defense. The court further found that the tests were at best inconclusive and that Kendhammer's trial attorneys chose to rely instead on testimony by a defense expert who testified that his analysis of glass patterns on the windshield showed how the pipe would have penetrated the windshield. The court concluded that these strategic decisions were reasonable and that the trial attorneys did not perform deficiently.

¶48 We likewise conclude that the record establishes that Kendhammer's trial attorneys made a deliberate strategic decision to exclude evidence of the pipe-drop tests, and that this decision was reasonable. Accordingly, Kendhammer does

23

not show that his trial attorneys performed deficiently by failing to present evidence of the pipe-drop tests.

¶49 Kendhammer next argues that his trial attorneys should have presented evidence showing that trucks frequently hauled metal pipes on County Highway M, the road where the incident occurred. Specifically, at the postconviction motion hearing, Kendhammer's postconviction counsel presented the following testimony. Two well-drillers testified that there were well drilling companies in the area that commonly traveled on County M in September 2016 and that the alleged pipe in this case was the type used by well-drillers. One of the well drillers testified that on the date of the incident, one of his trucks was on a service call in the area and might have driven by the scene of the incident to reach the customer, but that the well driller himself preferred taking a different route to the job site and that the truck was a 2001 white Ford 550 with a boom on the back. Two other people testified that they lived very near the incident scene, that trucks often hauled scrap including metal water pipe along County Highway M, and that the trucks were often overloaded.

¶50 Kendhammer's trial attorneys testified that they were aware of the availability of this testimony after investigation but decided not to present it. The circuit court found that the well-drillers' testimony did not show that their trucks were the type of truck that Kendhammer described, and was of little probative value given that the testimony presented at trial showed that surveillance videos in the area that were reviewed by law enforcement did not show any truck like that described by Kendhammer driving in the area at the time of the incident. The court also found that Kendhammer's trial attorneys did present testimony from a person who saw a pipe lying in the road near the incident scene some weeks after

the incident. The court determined that it was not deficient for the trial attorneys not to present additional testimony of pipes being hauled on County Highway M.

¶51 We conclude that the record establishes that Kendhammer's trial attorneys made a deliberate strategic decision not to present evidence that vehicles carrying pipes commonly drive along County Highway M, and that that decision was reasonable in light of the defense theory, articulated above, to focus not on how the pipe reached the windshield but instead on its penetration of the windshield being accidental. Accordingly, we conclude that Kendhammer does not show that his trial attorneys performed deficiently in failing to present this additional evidence.

¶52 Having rejected Kendhammer's claims that his trial attorneys erred in the respects described above, we also conclude that he fails to show that he is entitled to a new trial in the interest of justice. Kendhammer argues that even if his trial attorneys were not constitutionally ineffective, they failed to present "important evidence" and, therefore, the controversy was not fully tried. However, we have concluded that as to each such piece of "important evidence," his trial attorneys made reasonable strategic decisions not to present the evidence in order, among other reasons, not to undermine his defense. Accordingly, Kendhammer's argument fails.

## CONCLUSION

¶53 For the reasons stated, we affirm the circuit court's denial of Kendhammer's motion for postconviction relief.

25

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5 (2021-22).